# UNITED STATES DISTRICT COURT
**Southern District of Florida**

Case Number: ____________________

**EXTREME CRAFTS VII, LLC, a Florida Limited Liability Company,**

**Plaintiff,**

**vs.**

**CESSNA AIRCRAFT COMPANY, a foreign corporation,**

**Defendant.**

______________________________/

## COMPLAINT

Plaintiff, EXTREME CRAFTS VII, LLC, a Florida Limited Liability Company, by its undersigned attorneys, sues Defendant, CESSNA AIRCRAFT COMPANY, and alleges as follows:

## INTRODUCTION

1. This is an action brought by EXTREME CRAFTS VII, LLC, a Florida Limited Liability Company ("EXTREME CRAFTS") against CESSNA AIRCRAFT COMPANY, a Kansas corporation ("CESSNA") for a declaratory judgment and unjust enrichment.
2. The amount in controversy exceeds $75,000, as required under 28 U.S.C. 1332(a), exclusive of interests and costs and without considering counterclaims.
3. This court has jurisdiction based upon diversity of citizenship of the parties under 28 U.S.C. 1332.

4. Plaintiff EXTREME CRAFTS is a Florida corporation with its principal office and place of business in Palm Beach County, Florida.

5. At all times material hereto, and based upon information and belief, Defendant CESSNA is a Kansas corporation with its principal place of business in Kansas.

6. At all times material hereto, and upon information and belief, Defendant CESSNA has done business in the State of Florida and Palm Beach County, Florida, and should reasonably expect to be haled into this court in Florida.

7. Venue is properly in this Court as at least one cause of action accrued in Palm Beach County.

8. Venue is further proper in this Court as the event(s) creating the right to bring suit and giving rise to the action occurred in Palm Beach County.

9. Venue is further proper in this Court as the Plaintiff, EXTREME CRAFTS, suffered injuries and damage in Palm Beach County as a direct result of the Defendant's acts or omissions, alleged herein, and relating to the loss of deposit amounts.

10. The Plaintiff has retained the undersigned counsel to bring this suit and is incurring attorneys' fees and costs as a result.

## GENERAL ALLEGATIONS

11. In or about October 2007, the Plaintiff's representative, Frederick "Skip" Middleton (hereinafter "Plaintiff's representative"), requested pricing from the Defendant for a Citation Sovereign, which is an aircraft produced by the Defendant.

12. Thereafter, the Defendant's representative, David Armstrong (hereinafter "Defendant's representative"), followed up with the Plaintiff's representative repeatedly to persuade the Plaintiff to purchase a Citation Sovereign aircraft.

13. At all times material hereto, and upon information and belief, the Defendant's representative was authorized, or had apparent authority, to make representations and enter agreements on behalf of the Defendant due to the representative's position as Defendant CESSNA's Regional Sales Manager for Florida.

14. At all times material hereto, and upon information and belief, the Defendant's representative stated and held himself out as having superior knowledge and experience in the aircraft market and aircraft sales.

15. At the time of the Plaintiff's first inquiry about the possible purchase of a Citation Sovereign, and at all times material hereto, the Plaintiff's representative expressly stated to the Defendant's representative that the Plaintiff was interested in purchasing a Citation Sovereign as a speculative purchase for immediate resale and profit before taking delivery of the aircraft.

16. In or about November 2007, the Defendant's representative contacted the Plaintiff's representative to arrange a meeting in Boca Raton, Palm Beach County, Florida, for the purpose of negotiating the speculative purchase of a Citation Sovereign from the Defendant.

17. At the above referenced November 2007 meeting, Defendant's representative stated as follows:

    a.    The Citation Sovereign is in short supply.

    b.    The wait for a Citation Sovereign is two years.

    c.    Purchasing the Citation Sovereign now would place the Plaintiff in position to sell the Citation Sovereign contract within one year.

    d.    The Defendant's sales history for the Citation Sovereign showed that the Plaintiff would have no problem "flipping" or selling the referenced aircraft.

e.     The Plaintiff would definitely be able to sell the Citation Sovereign before the final deposit was required because the Defendant has buyers that do not want to wait two years for the aircraft.

f.     The Plaintiff would definitely net $1 million profit at a minimum upon resale of the Citation Sovereign.

18. After the referenced meeting in November 2007, and in telephone conversations and email communications, the Defendant's representative continued to make the same representations as set forth in the preceding paragraph to the Plaintiff's representative.

19. After the meeting in November 2007, and in telephone conversations and email communications, the Defendant's representative made the following additional representations to the Plaintiff's representative as follows:

a.     As of November 2007, there is a Citation Sovereign on hold for the Plaintiff for a 2009 "fixed" sales price of $16,975,000.

b.     As of November 2007, the Plaintiff could acquire a delivery date for a 2009 Citation Sovereign in the Third Quarter of 2009.

c.     Aside from the 2009 Citation Sovereign that was on hold for the Plaintiff, the next Citation Sovereign would not be available until the 1st Quarter of 2010, at a sales price of "$17,825,000 not to exceed base price."

d.     The Citation Sovereign is a more desirable and marketable aircraft than the other aircraft being considered by the Plaintiff due to its longer flight range and increased passenger capacity.

20. The foregoing representations set forth in paragraphs 17, 18 and 19, were material to Plaintiff's evaluation and agreement to contract with Defendant for the purchase of a Citation Sovereign.

21. The Plaintiff justifiably relied upon the Defendant's representations due, in part, to the position and stated superior knowledge of the aircraft market of the Defendant's representative and due to the production and pricing information in the possession of and provided by the Defendant's representative.

22. In reliance upon the Defendant's representations, the Plaintiff entered into a Purchase Agreement with the Defendant in or about November 2007 (hereinafter "Purchase Agreement").  A true and correct copy of the terms and conditions in said Purchase Agreement are attached hereto as Composite Exhibit "A" and incorporated herein by reference.

23. Pursuant to the Purchase Agreement, Plaintiff made an initial deposit of $250,000 in November 2007.

24. Thereafter, the Plaintiff made two additional payments of $1 million each to the Defendant toward the Purchase Agreement.

25. To date, the Plaintiff has paid the Defendant deposit payments amounting to $2,250,000 toward the purchase of a Citation Sovereign aircraft.

26. During the period from November 2007 through December 2009, the Plaintiff attempted to sell or assign the rights to the Citation Sovereign in compliance with the Purchase Agreement, but the Plaintiff was not able to do so.

27. As a result of the Plaintiff's inability to sell or assign its rights under the Purchase Agreement to purchase the Citation Sovereign, the Plaintiff sought to cancel the Purchase Agreement, and the Plaintiff ceased payment of additional amounts under the Purchase Agreement.

28. The Plaintiff requested return of the $2,250,000 in payments made to the Defendant.

29. By letter dated April 20, 2009, the Defendant refused to return any portion of the Plaintiff's deposit payments.

30. At all times material hereto, there was no calculation of what reasonable damages would be in the event of a partial or full default of obligations under the Purchase Agreement.

31. At all times material hereto, and upon information and belief, the Defendant has not suffered any damages, or any alleged damages of the Defendant damage have been ascertainable and significantly less than the contractual liquidated damages.

32. In addition, and at all times material hereto, the Plaintiff never received the referenced aircraft or benefit from its payment of $2,250,000.

33. To date, the Defendant is in possession of the $2,250,000 that the Plaintiff paid toward the referenced aircraft.

34. Upon information and belief, the Defendant has been able to sell or has sold to a third party the Citation Sovereign that Defendant contracted to sell to the Plaintiff under the Purchase Agreement.

35. Upon information and belief, the Defendant has been able to sell or has sold the Citation Sovereign at issue to a third party for a profit.

36. As a result, the Plaintiff, EXTREME CRAFTS, has been harmed and has incurred damages from the Defendant's refusal to return deposit payments to the Plaintiff and from the Plaintiff's inability to sell the referenced Citation Sovereign.

**COUNT I**
**DECLARATORY RELIEF**

37. Plaintiff, EXTREME CRAFTS, realleges paragraphs 1 through 36 with the same force and effect as if set forth at length herein, and incorporates said paragraphs by reference.

38. Upon information and belief, the Plaintiff and Defendant have an actual and justiciable controversy.

39. The interpretation of the Purchase Agreement and the liquidated damages provision is a matter of law for this Court to determine.

40. Upon information and belief, the provisions for liquidated damages in the Purchase Agreement are unreasonable and amount to a penalty.

41. Upon information and belief, the Plaintiff is entitled to a return of all or a significant portion of the deposit payments sent to the Defendant for the Citation Sovereign.

42. The Defendant maintains that it is entitled to keep all deposit payments from the Plaintiff pursuant to the Purchase Agreement.

43. The Plaintiff is uncertain as to its rights and obligations under the Purchase Agreement due to the provision for liquidated damages.

44. As a result, the Plaintiff is entitled to declaratory relief to determine the rights and obligations under the subject Purchase Agreement and the enforceability of the contractual provision for liquidated damages.

**WHEREFORE,** Plaintiff, EXTREME CRAFTS, respectfully requests this Court to enter judgment against the Defendant, award Plaintiff return of its deposit payments and resulting damages, together with prejudgment interest, costs of this action, attorneys' fees, and such further relief as this Court may deem just and equitable.

## COUNT II
## UNJUST ENRICHMENT

45. Plaintiff, EXTREME CRAFTS, realleges paragraphs 1 through 36 with the same force and effect as if set forth at length herein, and incorporates said paragraphs by reference.

46. The Plaintiff has conferred a benefit upon the Defendant through the Plaintiff's deposit payments and the Defendant's possession of the aircraft to be purchased.

47. At all times material hereto, the Defendant has had knowledge of the benefit conferred upon it.

48. At all times material hereto, the Defendant accepted and retained the benefit conferred.

49. Despite requests from the Plaintiff, the Defendant has refused to return the Plaintiff's deposit.

50. Upon information and belief, the Defendant's retention of the Plaintiff's deposit payments of $2,250,000 constitutes an unreasonable penalty.

51. The Defendant's retention of the Plaintiff's deposit payments is unjust under the circumstances.

52. Based upon the foregoing, Plaintiff is entitled to return of deposit payments and for any and all additional damages resulting from the Defendant's refusal to return Plaintiff's deposit payments.

///

///

///

///

///

**WHEREFORE,** Plaintiff, EXTREME CRAFTS, respectfully requests this Court to enter judgment against CESSNA, and to award Plaintiff damages for the deposit amounts paid and additional damages resulting from Defendant's refusal to return said deposit amounts, together with prejudgment interest, costs of this action, attorneys' fees, and such further relief as this Court may deem just and equitable.

Date: February 17, 2010

Respectfully submitted,

BY: ______________________

**DEBORAH S. MARTIN, ESQ.**
Fla. Bar No.: 004707
**Walter H. Messick, P.A.**
1900 Corporate Blvd., Suite 101 West
Boca Raton, FL 33431
*Direct Line: 561-213-4012*
*Telefax: 561-989-0239*
*E-mail: deborah.martin1@comcast.net*

Attorneys for Plaintiff

# Composite Exhibit "A"



## *EXECUTIVE SUMMARY*
## *Basic Consideration*

This proposal for the sale of one (1) Cessna Citation Sovereign Aircraft is submitted by Cessna's Citation Marketing Division.

**PRICE:**

| | |
|---|---|
| Base Price | $16,975,000 |
| Optional Equipment | TBD |
| Interior/Exterior | TBD |
| **Total Aircraft Price** | **$16,975,000*** |

**Optional Equipment and Interior/Exterior to be specified on or before November 25, 2008.**

**TBD-To Be Determined**
***Excludes TBD. The TBD pricing is not included in the Aircraft pricing shown above.**

**PAYMENT TERMS:**

- An initial deposit of $250,000 is due upon offer by Purchaser
- A second deposit of $1,000,000 is due 18 months prior to Preliminary Delivery Month
- A third deposit of $1,000,000 is due 12 months prior to the Preliminary Delivery Month
- A fourth deposit of $1,000,000 is due 6 months prior to the Preliminary Delivery Month
- Balance is due upon delivery of Aircraft

**PRELIMINARY DELIVERY QUARTER:**

- Third (3) Quarter of 2009 - F.A.F., Wichita, Kansas

**CONDITIONS OF SALE:**

- This offer is in accordance with the terms and conditions outlined in our Purchase Agreement Form CA-581-SOV-E08/07-00 (enclosed).

**DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.**



***EXECUTIVE SUMMARY***
***Basic Consideration***
***(Continued)***

**PROPOSAL EXPIRATION:**

- The prices quoted herein are valid through November 19, 2007. All aircraft are subject to prior sale.

**CITATION PACKAGE:**

- The purchase of a Citation Sovereign includes a comprehensive warranty, training, service & support, and CESCOM enrollment (see Citation Package section for details).

- For competitive financing solutions, contact Cessna Finance Corporation (see Citation Package for details).

DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.

## *STANDARD EQUIPMENT*

The Cessna Citation Sovereign is a pressurized, low-wing monoplane with standard provisions for nine passengers plus a crew of two. The aircraft is equipped with two Pratt & Whitney of Canada, Corp., PW306C turbofan engines (6,000 hour TBO) and is certified to the requirements of U.S. FAA FAR Part 25, Transport Category.

**AVIONICS AND SYSTEMS:**

- Primus EPIC System – *Honeywell*
  - Dual 8" x 10" Primary Flight Displays
  - Single 8" x 10" Multi-Function Display
  - Single 8" x 10" Engine Indicating and Crew Alerting System Display
  - Digital Primus EPIC Auto Pilot/Flight Directory
- Single Radio Altimeter
- Dual Flight Management Systems
  - Dual Global Positioning Sensor Units
- Turbulence Detection Radar
- Enhanced Ground Proximity Warning System Module
- Primus EPIC Radio Package
  - Dual VHF Communication Units
  - Dual Navigation Units
  - Dual Mode-S Diversity Transponders
  - Dual Distance Measuring Equipment
  - Single Automatic Direction Finder

- Dual Attitude Heading Reference Systems – *Collins*
- Traffic Collision Avoidance System 2000 – *ACSS*
- Cockpit Voice Recorder – *L3 Communications*
- Emergency Locator Transmitter – *Serpe-Eism*
- Auxiliary Power Unit – *Honeywell*
- Dual Nickel Cadmium 44 Amp Hr Batteries – *Marathon*
- 76 Cubic Foot Oxygen Bottle
- Two Quick-Donning Oxygen Masks

DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.

CITATION
SOVEREIGN

## *STANDARD EQUIPMENT*
## *(Continued)*

**INTERIOR:**

**Flight Deck**

- Cockpit assist handle
- Monorail sunvisors
- Leather covered crew seats
- LH/RH two book navigation chart cases (RH has 110 VAC Outlet)
- Flight Deck Sliding Doors

**Cabin Area**

- Nine passenger double club seating with a single fwd side-facing seat
- LH fwd coat closet with nav chart, flight manual, coat and briefcase storage
- RH fwd refreshment center
- Eight pedestal-mounted seats with full berthing, swivel and pedestal tracking features
- Four executive tables
- Indirect lighting in the continuous dropped aisle
- Up to four individual 110 VAC outlets
- Aft lavatory with externally serviceable, flushing, non-belted toilet, an adjacent sink with running temperature controlled water, and an additional 110VAC outlet
- Large centerline closet
- Cessna Design Center (CDC) standard fabrics, leathers, carpets, laminates, wood veneers and plating
- Pleated electric window shades

To customize the Citation Sovereign to specific requirements, carefully selected avionics, accessories, and interior options are available on request.

DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.

## *WARRANTY*

Cessna provides a comprehensive warranty, as best described in the Specification and Description book dated July 2007, Revision B with each new Citation Sovereign aircraft which covers the following:

- Airframe Components Manufactured by Cessna - Five (5) Years or 5,000 Hours, whichever occurs first
- Standard Honeywell Avionics – Five (5) Years or 5,000 Hours, whichever occurs first
- Other Standard Avionics – Two (2) Years
- Engines - Five (5) Years or 3,000 Hours, whichever occurs first
- All remaining items per Specification and Description book - One (1) Year

All warranties are administered by Cessna. Warranty coverage includes both parts and labor credit for work performed at authorized service facilities.

The confidence that Cessna has in its product is expressed by this warranty. It is the straightforward, simple design of the Citation and the solid reliability of its components that permit Cessna to extend such a warranty to its customers.

**DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.**

## *TRAINING*

Flight and ground training for two pilots and two mechanics are included with the purchase of each Citation aircraft. This training is conducted at FlightSafety International's Citation Learning Center in Wichita, Kansas, or at an alternative FlightSafety location upon mutual agreement with Cessna Aircraft Company.

FlightSafety, a leader in flight training since 1951, uses the latest in teaching aids. Classrooms are equipped with a wide range of audio-visual devices, animated systems trainers, mockups, cutaways, and working models. Professional classroom instructors explain aircraft systems, introduce problems, and explain the logic behind the solutions to problems.

The Citation flight simulators incorporate state-of-the-art digital technology and are equipped with motion and full-color visual display systems. These FAA approved Level "C" and "D" simulators realistically duplicate every phase of flight in weather conditions ranging from day/night VFR down to IFR minimums. Pilots can practice all normal and emergency procedures with no danger to themselves or an aircraft.

The final flight training and type rating are conducted by FlightSafety instructor pilots either in the full motion simulator, or in your Citation in Wichita, Kansas.

The end result of these comprehensive FlightSafety learning programs for pilots and maintenance technicians is to effectively train your crew in the operation of your Citation.

**DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.**

## *SERVICE AND SUPPORT*

Support is the key to the overall effective use of any aircraft and is the reason that Cessna maintains the largest service and support network in the industry dedicated solely to the Citation series of business jets. Presently, there are nine Citation Service Centers in the United States (Milwaukee, Wisconsin; Sacramento, California; Long Beach, California; Wichita, Kansas; Orlando, Florida; Newburgh, New York; Toledo, Ohio; Greensboro, North Carolina; and San Antonio, Texas). The Wichita Citation Service Center is the world's largest general aviation maintenance facility. These service centers are augmented by domestic service centers and international authorized service facilities, including one in Canada, six in Latin America (Argentina, Brazil, Colombia, Mexico, Paraguay and Venezuela), ten in Europe (France, Switzerland, Austria, two in the UK, two in Italy, and three in Germany), one in South Africa, and four in the Far East (Singapore, Japan, and two in Australia). In addition to handling routine service, these facilities will handle all warranties on the Citations. No matter where you are in the world, an authorized service center is nearby.

Combined with these service centers, Cessna maintains a staff of field service representatives to assist with any difficulties that may occur with the Citation. These field service representatives will also assist with your transition into your Citation by providing, upon request: 1) pre-delivery visits so that any parts and information will arrive before delivery as necessary; 2) post-delivery visits to help with any start-up problems and a review of warranty procedures; and 3) provide 24-hour service for an AOG (aircraft on ground) problem. All of these services are provided so that when your Citation arrives all personnel will be well acquainted with it and ready to put it into service.

Because the Citations are sold factory direct, as opposed to through a dealer or sales outlet network, the Citation customer is in closer contact with the service and support program. Unlike aircraft dealers, who are involved with many different products, the Citation field service representatives are dedicated only to the Citation series of business jets. To you, the customer, this means better access to spares, faster processing of warranty claims, and direct contact with experts who work exclusively with the Citations.

**DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.**

CITATION
SOVEREIGN

## *CESCOM*

Enrollment in CESCOM, Cessna's computerized maintenance record service, is included for one year with the purchase of a Citation. Maintenance information is gathered on a fleet-wide basis from operators based in more than 50 countries around the world. This information enables Cessna to continuously monitor the condition of the fleet. It also is used to keep track of "fleet leaders", in terms of hourly utilization, to monitor high time aircraft and to anticipate any possible problems before they occur in the balance of the fleet.

**CESCOM:**

- Provides you with a permanent maintenance record
- Assists you in scheduling maintenance
- Saves you time in aircraft operation budgeting
- Covers a wide range of items
- Can be customized to suit your needs
- Gives you a direct line to Citation engineering and manufacturing

Computerized maintenance makes it possible to control your support inventories more efficiently and economically, reduces aircraft maintenance downtime, and provides you with simplified budget planning information.

DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.

CITATION
SOVEREIGN

## *CESSNA FINANCE CORPORATION*

*Your Financing Solution*

For over 50 years, Cessna Finance Corporation has supported Cessna Aircraft Company and its customers throughout the world. They are the global leader in aviation-only financing, making them uniquely experienced to understand your needs.

Benefits of Cessna Finance Corporation:

- Consultative approach to understand your requirements
- Financing experience worldwide
- Competitive financing solutions
- Loan and lease products
- Flexible deal structures
- Citation expertise
- Seamless process
- Preserves traditional banking sources for your non-aviation needs

Please contact Mr. Tracy Cassil, Senior Vice President, Global Finance at 316.660.1476 or visit us at www.cfcloan.com

DUE TO THE EXCLUSIVE NATURE OF THIS PROPOSAL, CESSNA AIRCRAFT COMPANY REQUESTS THAT ITS CONTENTS BE TREATED AS CONFIDENTIAL.



# Purchase Agreement

between Cessna Aircraft Company and
Extreme Crafts VII LLC

CITATION SOVEREIGN

# Purchase Agreement

This Citation Sovereign Purchase Agreement (Agreement) is entered into by and between Cessna Aircraft Company (Seller) and Extreme Crafts VII LLC (Purchaser).

For and in consideration of the mutual promises, covenants, understandings, agreements, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. AIRCRAFT PURCHASE. Seller hereby agrees to sell and Purchaser hereby agrees to purchase a 3rd Quarter 2009 Cessna Model 680 CITATION Sovereign, as described in the Specification and Description dated July 2007, Revision B (Specification), a copy of which is attached hereto and incorporated herein as Exhibit A.
2. TRADE-IN. Unless stated otherwise in the Agreement, a Trade-In is not part of this Agreement.
3. BASE PRICE. All payments shall be made in U.S. dollars. The Aircraft Base Price is $ **16,975,000**
4. OPTIONAL EQUIPMENT AND OTHER CHARGES. The Optional Equipment Selection Guide dated TBD is effective for 2009 deliveries. Other charges include:
   a. Final aircraft specifications due on or before Order Due Date. $ TBD
   b. Special Conditions listed in Exhibit B and incorporated herein $ TBD

   Total Optional Equipment and Other Charges are: +TBD $ **0**
5. TOTAL PURCHASE PRICE. Any to be determined (TBD) pricing is not included in the Total Purchase Price which is . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . +TBD $ **16,975,000**
6. PAYMENT TERMS.
   a. Initial Deposit due upon offer by Purchaser $ (250,000)
   b. Second Deposit due 18 months prior to preliminary delivery month $ (1,000,000)
   c. Third Deposit due 12 months prior to preliminary delivery month $ (1,000,000)
   d. Fourth Deposit due 6 months prior to preliminary delivery month $ (1,000,000)
   e. Balance due upon delivery +TBD $ **13,725,000**
7. DELIVERY.
   a. Preliminary delivery quarter Fly-Away-Factory (F.A.F.) Wichita, Kansas, is 3rd Quarter 2009.
   b. Scheduled Delivery Month will be furnished to Purchaser by Seller six (6) months prior to the last day of the preliminary delivery quarter.
8. ORDER DUE DATE. Final Optional Equipment (including interior/exterior) shall be specified on or before the order due date (Order Due Date), which is November 25, 2008 .

9. SPECIFICATION REVISIONS. Seller reserves the right to revise the Specification whenever occasioned by product improvements, U.S. Government regulations, or other good manufacturing and/or vendor cause as long as such revisions do not result in a reduction in performance standards, as defined in the Specification. Seller shall notify Purchaser of any such revisions.

10. PRICES AND PAYMENTS.

   a. Aircraft Price. The price of the Aircraft and other applicable charges set forth in Paragraph Nos. 3, 4, and 5 include CITATION SOVEREIGN standard equipment, optional equipment selected by Purchaser as listed in Paragraph No. 4a, Aircraft technical and service publications for five (5) years, Computerized Maintenance Record Service (CESCOM) for a period of one (1) year, and training for pilot and maintenance personnel in accordance with the CITATION SOVEREIGN Crew Training Agreement in Exhibit A. The price is also subject to additional payment adjustments in accordance with Paragraph No. 12 herein.

   b. Acceptable Methods of Payment. All payments shall be made in United States dollars at Wichita, Kansas, U.S.A., by certified check, bank cashier's check, wire transfer, or such other negotiable instruments acceptable to Seller. All payment documentation shall specifically show the funds come directly from or were initiated by Purchaser.

11. SELLER'S COMMITMENTS. Seller commits:

   a. Order of Precedence. To provide the Aircraft to Purchaser in accordance with the Specification as modified in writing by mutual agreement of the parties. In the event of conflict, the terms and conditions of this Agreement, exclusive of Exhibit A, take precedence over Exhibit A.

   b. Delivery Notification. To notify Purchaser at least 30 days prior to the last day of the Scheduled Delivery Month, of the day the Aircraft will be ready for delivery (Ready-for-Delivery-Date).

   c. Ownership Transfer. To furnish to Purchaser at the time of delivery of the Aircraft a Bill of Sale on the appropriate Federal Aviation Administration form transferring ownership of the Aircraft to the Purchaser free and clear of all encumbrances, unless otherwise agreed by the parties.

12. PURCHASER'S COMMITMENTS. Purchaser commits:

   a. Purchaser's Default. In the event this Agreement is breached or terminated by Purchaser for any cause whatsoever other than Seller's default, including Purchaser's failure to make all payments when due, then all deposits shall be retained by Seller not as a forfeiture but as liquidated damages for default and this Agreement shall end.

   b. Changes and Additions. No changes or additions to the selection of optional equipment and interior and exterior selections shall be made after the Order Due Date listed in Paragraph No. 8, unless approved by Seller. Purchaser shall pay to Seller additional charges for any changes or additions. Seller may change the Scheduled Delivery Date upon written notice to Purchaser if any changes or additions delay the Aircraft delivery. Purchaser agrees Seller shall appoint the Aircraft in Seller's demonstration aircraft configuration, as may be in effect from time-to-time, if Purchaser fails to submit an order for optional equipment and interior/exterior selections by the Order Due Date.

   c. Additional Charges. To pay for: (i) additional or substituted optional equipment ordered by Purchaser pursuant to Paragraph No. 12b immediately above; (ii) Seller's charges, if any, for changes or additions requested by Purchaser; (iii) any national, state, or local taxes other than taxes on income applicable to the sale of the Aircraft or this transaction whether imposed on either Purchaser or Seller (whether imposed at the time of delivery and sale or thereafter); (iv) transportation charges for mutually agreed Aircraft delivery outside Wichita, Kansas; (v) any import duties, import taxes, or other import charges imposed by foreign governments; and (vi) any other mutually agreed charges.

   d. Final Payment Provisions. Within seven days after the Ready-for-Delivery-Date, to accept delivery of the Aircraft at Wichita, Kansas or such other mutually agreed location, and to pay Seller the balance due on the Aircraft and all other charges due under this Agreement. In all events, the full balance due on the Aircraft and all other charges shall be paid no later than seven days following the Ready-for-Delivery-Date or upon delivery of the Aircraft, whichever first occurs. If any charges are unknown at that time, the same shall be paid within ten days upon advice from Seller to Purchaser.

e. Kansas State Sales Tax. To pay Kansas State Sales Tax or execute an Exemption Certificate.

13. DELIVERY. Prior to acceptance by Purchaser, the Aircraft shall be subject to inspection and a flight test of not more than three hours' duration controlled by Seller and participated in by not more than two of Purchaser's representatives. Seller shall have a reasonable time to correct any discrepancies disclosed by such flight test and, if necessary, the Ready-for-Delivery-Date will be adjusted accordingly. Acceptance of the Aircraft, as evidenced by receipt acknowledging delivery, shall constitute Purchaser's agreement that the Aircraft conforms to the specifications, standards, and other requirements of this Agreement or is otherwise acceptable to Purchaser.

14. TITLE AND RISK OF LOSS. Title to the Aircraft and risk of loss for the Aircraft transfer from Seller to Purchaser upon Purchaser's receipt of the Bill of Sale.

15. AIRCRAFT DELIVERY DELAY. Seller shall not be liable to Purchaser for any delay in making delivery for any cause whatsoever; provided, however, if Seller should fail to make delivery within 90 days after the last day of the Scheduled Delivery Month and such failure is not due to fire, flood, strikes, or other industrial disturbances, accident, war, riot, insurrection, delay in vendor deliveries, or other causes beyond the control of the Seller, or, if for any reason Seller should fail to make delivery within 180 days after the last day of the Scheduled Delivery Month, Purchaser shall have the right to demand return of all deposits plus interest, unless Purchaser agrees to a later Scheduled Delivery Month. If Purchaser makes such a demand, interest on returned deposits shall be computed from the date of receipt of the respective deposits by Seller to the date Seller forwards the refund to Purchaser at the one month LIBOR rate as advertised in the Wall Street Journal under Money Rates on the first day of the month in which it is determined that a refund with interest will be made. Upon return of deposits plus interest, Purchaser releases all rights against Seller pursuant to this Agreement and any breach thereof. Purchaser agrees that its sole remedy for any failure of Seller to perform any part of this Agreement up to and including Aircraft delivery is limited to the return of deposits plus interest.

16. NOTICES. Any formal notices given pursuant to this Agreement shall be in writing and shall be sent by registered or certified mail, courier service or facsimile addressed in case of notice to Seller, to Vice President, Administration, Citation Marketing, Cessna Aircraft Company, OneCessna Boulevard, Wichita, Kansas 67215, Facsimile No. 316/517-6640, and in case of notice to the Purchaser to the name and address provided herein, or such other address as the party to receive the notice designates in writing. Notices are effective upon receipt, except facsimiles, which are effective when sent.

17. SOLE AGREEMENT. This Agreement is wholly integrated and is the sole agreement controlling this Aircraft purchase and sale. It is exclusive of any other express, implied, verbal, or written representations, omissions, or agreements, and is binding on Purchaser and Seller, their heirs, executors, administrators, successors or assigns. Purchaser acknowledges receipt of a written copy of this Agreement, which may not be modified in any way except by written agreement executed by authorized representatives of all parties.

18. ASSIGNMENT. This Agreement, including the rights of Purchaser hereunder, may not be assigned by Purchaser except to a wholly-owned subsidiary, successor in interest by name change or otherwise, or to a financial institution solely for the purpose of providing Purchaser financing or leasing, and then only upon the prior written consent of Seller.

19. KANSAS LAW. Purchaser and Seller expressly agree the terms of the United Nations Convention on Contracts for the International Sale of Goods, 1980, and any successor thereto, and the Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (collectively the Capetown Convention), and any successor thereto, do

not take precedence over and are specifically excluded from the Agreement. This Agreement shall be governed in all respects and shall be construed, and the legal relationships between the parties shall be determined, in accordance with applicable commercial laws of the State of Kansas, U.S.A.; however, unless Purchaser resides in the State of Kansas, the provisions of the Kansas Consumer Protection Act, K.S.A. 50-623, et. seq., as may be in effect from time-to-time shall not apply to this Agreement or the parties hereto. Purchaser also agrees to comply with all applicable U.S. Government export, re-export, import and customs regulations.

20. SEVERABILITY AND CAPTIONS. If any portion of this Agreement is invalid or unenforceable, this Agreement shall be considered divisible as to such provisions and the remainder of the Agreement valid and binding as though such provisions were not included herein. Captions used in this Agreement are for convenience of reference only and shall not be deemed a part of this Agreement nor used in the construction of its meaning.

21. SIGNING AUTHORITY. This Agreement shall become a binding contract upon its final acceptance and execution by Seller in Wichita, Kansas. The signatories to this Agreement verify that they have read the complete Agreement, understand its contents, and have full authority to bind and hereby do bind their respective parties.

22. **WARRANTY PROVISIONS. EXCEPT FOR THE EXPRESS TERMS OF SELLER'S WRITTEN LIMITED AIRCRAFT WARRANTY WHICH ARE SET FORTH IN EXHIBIT A, SELLER MAKES NO AND HEREIN SPECIFICALLY EXCLUDES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WHICH EXTEND BEYOND THE FACE HEREOF OR THEREOF. SELLER SPECIFICALLY EXCLUDES AND DISCLAIMS ANY AND ALL REPRESENTATIONS AND/OR WARRANTIES NOT INCLUDED WITHIN THE FOUR CORNERS OF THIS AGREEMENT. THE WRITTEN LIMITED AIRCRAFT WARRANTY OF SELLER IS IN LIEU OF ANY OTHER WARRANTY, OBLIGATION OR LIABILITY WHATSOEVER BY REASON OF THE MANUFACTURE, SALE, LEASE, OR USE OF THE AIRCRAFT AND NO PERSON OR ENTITY IS AUTHORIZED TO MAKE ANY OTHER REPRESENTATIONS OR WARRANTIES OR TO ASSUME ANY OBLIGATIONS ON BEHALF OF SELLER REGARDING THE AIRCRAFT WARRANTY. THE REMEDIES OF REPAIR OR REPLACEMENT ARE THE ONLY REMEDIES AVAILABLE UNDER SELLER'S WRITTEN LIMITED AIRCRAFT WARRANTY. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER ARISING OUT OF CONTRACT, WARRANTY OR TORT (INCLUDING, WITHOUT LIMITATION, ACTIVE OR PASSIVE NEGLIGENCE, IMPUTED LIABILITY, OR STRICT LIABILITY) OR BY STATUTE OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS OR GOODWILL, LOSS OF USE, LOSS OF TIME, INCONVENIENCE, LOSS OF VALUE, OR COMMERCIAL LOSS. THE ENGINES AND ENGINE ACCESSORIES ARE SEPARATELY WARRANTED BY THEIR MANUFACTURER AND ARE EXPRESSLY EXCLUDED FROM THE LIMITED AIRCRAFT WARRANTY OF SELLER. THE LAWS OF SOME STATES DO NOT PERMIT CERTAIN LIMITATIONS ON WARRANTIES OR REMEDIES. IN THE EVENT SUCH A LAW APPLIES, THE FOREGOING EXCLUSIONS AND LIMITATIONS ARE AMENDED INSOFAR AND ONLY INSOFAR AS REQUIRED BY SAID LAW.**

**(Purchaser)**

**Extreme Crafts VII LLC**
999 West Yamato Road, Suite 200
Boca Raton, Florida 33431

______________________________
**(Signature)**

By ______________________________
**(Printed Name)**

Title: ______________________________

Offer Date: ______________________________

**(Seller)**

**Cessna Aircraft Company**
One Cessna Boulevard
Wichita, Kansas 67215 U.S.A.

______________________________
**(Signature)**

By ______________________________
**(Printed Name)**

Title: Vice President, Administration

Acceptance Date: ______________________________

Exhibit A

CITATION
SOVEREIGN

# Specification & Description

July 2007 Revision B
Units 680-0184 to TBD

Please Sign and Date:

Purchaser: ______________________________

Seller: ______________________________



# SPECIFICATION AND DESCRIPTION

UNITS 680-0184 TO TBD

JULY 2007

REVISION B

Citation Marketing
Cessna Aircraft Company
P.O. Box 7706
Wichita, Kansas 67277-7706

Copyright 2007 Cessna Aircraft Company



July 2007, Revision B

## INTRODUCTION

This Specification and Description is published for the purpose of providing general information for the evaluation of the design, performance, and equipment of the Cessna Citation Sovereign, Units 680-0184 to TBD. This document supersedes all previous Specification and Description documents and describes only the Cessna Citation Sovereign Model 680, its powerplants and equipment.

Due to the time span between the date of this Specification and Description and the scheduled delivery date of the Aircraft, Cessna reserves the right to revise the "Specification" whenever occasioned by product improvements, government regulations or other good cause as long as such revisions do not result in a material reduction in performance.

In the event of any conflict or discrepancy between this document and the terms and conditions of the purchase agreement to which it is incorporated, the terms and conditions of the purchase agreement govern.

For additional information contact:

Citation Marketing
Cessna Aircraft Company
P.O. Box 7706
Wichita, Kansas 67277-7706

Telephone: 316-517-6449
Telefax: 316-517-6640

**WARNING:** This product contains Halon 1211, Halon 1301, and also R-134A. Furthermore, the product was manufactured with CFC-12 and 1-1-1 Trichloroethane, substances which harm public health and environment by destroying ozone in the upper atmosphere.



## TABLE OF CONTENTS

Cessna Citation Sovereign Specification and Description

Section — Page

1. General Description . . . 3
   - 1.1 Certification . . . 3
   - 1.2 Approximate Dimensions . . . 3
   - 1.3 Design Weights and Capacities . . . 6
2. Performance . . . 6
3. Structural Design Criteria . . . 7
4. Fuselage . . . 7
5. Wing . . . 8
6. Empennage . . . 8
7. Landing Gear . . . 8
8. Powerplants . . . 9
9. Systems . . . 9
   - 9.1 Flight Controls . . . 9
   - 9.2 Fuel System . . . 10
   - 9.3 Hydraulic System . . . 10
   - 9.4 Electrical System . . . 10
   - 9.5 Pressurization and Environmental System . . . 11
   - 9.6 Oxygen System . . . 11
   - 9.7 Ice and Rain Protection . . . 11
10. Flight Compartment, Avionics and Instrumentation . . . 12
    - 10.1 General . . . 13
    - 10.2 Flight Compartment . . . 13
    - 10.3 Avionics . . . 14
11. Interior . . . 19
    - 11.1 Cabin . . . 19
    - 11.2 Baggage Compartment . . . 20
12. Exterior . . . 20
13. Additional Equipment . . . 20
14. Emergency Equipment . . . 20
15. Documentation and Technical Publications . . . 20
16. Computerized Maintenance Record Service (CESCOM) . . . 21
17. Limited Warranties . . . 21
    - 17.1 Cessna Citation Sovereign Limited Warranty . . . 21
    - 17.2 New Engine Warranty . . . 22
    - 17.3 Summary of Honeywell APU Warranty . . . 23
18. Citation Sovereign Crew Training Agreement . . . 23

FIGURE I — CITATION SOVEREIGN EXTERIOR DIMENSIONS . . . 4
FIGURE II — CITATION SOVEREIGN INTERIOR DIMENSIONS . . . 5
FIGURE III — CITATION SOVEREIGN INSTRUMENT PANEL AND PEDESTAL LAYOUT . . . 12
FIGURE IV — CITATION SOVEREIGN STANDARD FLOORPLAN . . . 19



CITATION
SOVEREIGN

July 2007, Revision B

MANUFACTURER ____ CESSNA AIRCRAFT COMPANY

MODEL ____ 680

## 1. GENERAL DESCRIPTION

The Cessna Citation Sovereign is a low-wing aircraft with retractable tricycle landing gear and a cruciform tail. A pressurized cabin accommodates a crew of two plus eight to twelve passengers (nine is standard). Two Pratt & Whitney Canada (P&WC) PW306C FADEC controlled turbofan engines are pylon-mounted on the rear fuselage. Fuel stored in the wings offers generous range for missions typical of this class aircraft. Space for baggage is provided in the tailcone with additional storage space available in the cabin.

Multiple structural load paths and system redundancies have been built into the aluminum airframe. Metal bonding techniques have been used in many areas for added strength and reduced weight. Certain parts with non-critical loads such as the nose radome and fairings are made of composite materials to save weight. The airframe design incorporates anti-corrosion applications and lightning protection.

Cessna offers a third-party training package for pilots and mechanics, and various manufacturers' warranties as described in this book. Cessna's worldwide network of authorized service centers provides a complete source for all servicing needs.

### 1.1 Certification

The Model 680 is certified to the requirements of U.S. 14 CFR Part 25, Transport Category, including day, night, VFR, IFR, and flight into known icing conditions. Category II approval is available as an option. The Sovereign is compliant with all RVSM certification requirements. (Note: specific approval is required for operation within RVSM airspace; Cessna offers a fee-based service to assist with this process.) An interior configuration of ten or more passengers is not available for 14 CFR Part 135 operations.

The Purchaser is responsible for obtaining aircraft operating approval from the relevant civil aviation authority. International certification requirements may include modifications and/or additional equipment; such costs are the responsibility of the Purchaser.

### 1.2 Approximate Dimensions

Overall Height . . . 20 ft 4 in (6.20 m)
Overall Length . . . 63 ft 6 in (19.35 m)
Overall Width . . . 63 ft 4 in (19.30 m)

**Wing**

Span (does not include tip lights) . . . 63 ft 2 in (19.25 m)
Area . . . 515.9 ft$^2$ (47.93 m$^2$)
Sweepback (leading edge) . . . 16.3 degrees
Sweepback (at 25% chord) . . . 12.7 degrees

**Horizontal Tail**

Span (overall) . . . 27 ft 7 in (8.41 m)
Area . . . 138.5 ft$^2$ (12.87 m$^2$)
Sweepback (at 25% chord) . . . 22.6 degrees

**Vertical Tail**

Height . . . 10 ft 11 in (3.33 m)
Area . . . 95.3 ft$^2$ (8.85 m$^2$)
Sweep (at 25% chord) . . . 38.3 degrees

**Cabin Interior**

Height (maximum over aisle) . . . 68 in (1.73 m)
Width (trim to trim) . . . 66 in (1.68 m)
Length (forward pressure bulkhead to aft pressure bulkhead) . . . 30 ft 9 in (9.37 m)

**Landing Gear**

Tread (main to main) . . . 10 ft 0 in (3.05 m)
Wheelbase (nose to main) . . . 27 ft 10 in (8.49 m)

## 1. GENERAL DESCRIPTION (Continued)

FIGURE I — CITATION SOVEREIGN EXTERIOR DIMENSIONS

CITATION
SOVEREIGN

## 1. GENERAL DESCRIPTION (Continued)

66 in (1.67 m)
244 in (6.20 m)
59 in (1.50 m)
66 in (1.68 m)

30 in
(.76 m)
20 in
(.51 m)
55 in
(1.40 m)
11 in
(.28 m)
14 in
(.36 m)
36 in
(.91 m)

68 in
(1.73 m)

FIGURE II — CITATION SOVEREIGN INTERIOR DIMENSIONS



## 1. GENERAL DESCRIPTION (Continued)

### 1.3 Design Weights and Capacities

| | |
|---|---|
| Maximum Ramp Weight | 30,550 lb (13,857 kg) |
| Maximum Take Off Weight | 30,300 lb (13,744 kg) |
| Maximum Landing Weight | 27,100 lb (12,292 kg) |
| Maximum Zero Fuel Weight | 20,450 lb (9,276 kg) |
| Standard Empty Weight * | 17,460 lb (7,920 kg) |
| Useful Load | 13,090 lb (5,938 kg) |
| Fuel Capacity (useable) at 6.70 lb/gal | 11,216 lb (5,087 kg) |

* Standard empty weight includes unusable fuel, full oil, standard interior, and standard avionics.

## 2. PERFORMANCE

All performance data is based on a standard aircraft configuration, operating in International Standard Atmosphere conditions with zero wind. Takeoff and landing field lengths are based on a level, hard surface, dry runway. Actual performance will vary with individual airplanes and other factors such as environmental conditions, aircraft configuration, and operational/ATC procedures.

Takeoff Runway Length . . . 3,640 ft (1,109 m)
(Maximum Takeoff Weight, Sea Level, ISA, Balanced Field Length per FAR 25, 15° Flaps)

Climb Performance . . . 23 min to 43,000 ft (13,106 m)
(Maximum Takeoff Weight, from Sea Level, ISA)

Maximum Altitude . . . 47,000 ft (14,326 m)

Maximum Cruise Speed (± 3%) . . . 458 KTAS (848 km/hr or 527 mph)
(Mid-Cruise Weight, 35,000 ft (10,668 m), ISA)

NBAA IFR Range (200 nm alternate) (± 4%) . . . 2,847 nm (5,272 km or 3,276 mi)
(Maximum Takeoff Weight, Full Fuel, Optimal Climb and Descent, Maximum Cruise Thrust at 47,000 feet)

Landing Runway Length . . . 2,650 ft (808 m)
(Maximum Landing Weight, Sea Level, ISA, per FAR 25)

Certificated Noise Levels
- Flyover . . . 71.8 EPNdB
- Lateral . . . 87.5 EPNdB
- Approach . . . 91.3 EPNdB



## 3. STRUCTURAL DESIGN CRITERIA

The Citation Sovereign airframe is conventional in design, incorporating aluminum alloys, steel and other materials as appropriate. Engineering principles using multiple load paths, low stress levels and small panel size are incorporated in the primary structure.

Limit Speeds

$V_{MO}$ 8,000 ft (2,438 m) to 29,833 ft (9,093 m) . . . . . . . . . . 305 KIAS (565 km/hr, 351 mph)

$M_{MO}$ 29,833 ft (9,093 m) and above . . . . . . . . . . Mach 0.80

Flap Extension Speeds

$V_{FE}$ 0° to 7° Extension . . . . . . . . . . 250 KIAS (463 km/hr, 288 mph)

$V_{FE}$ 7° to 15° Extension . . . . . . . . . . 200 KIAS (370 km/hr, 230 mph)

$V_{FE}$ 15° to 35° Extension . . . . . . . . . . 175 KIAS (324 km/hr, 201 mph)

Landing Gear Operating and Extended Speeds

$V_{LO}$ . . . . . . . . . . 210 KIAS (389 km/hr, 242 mph)

$V_{LE}$ . . . . . . . . . . 210 KIAS (389 km/hr, 242 mph)

## 4. FUSELAGE

The fuselage has a constant circular cross section and is attached to the wing without any cutouts for the spar. A dropped isle from just behind the cockpit through the lavatory provides stand-up access throughout the cabin.

The keyed cabin door is located on the forward left-hand side of the fuselage. It is hinged at the bottom and has six locking cams. The aircraft is certified with a single, passive pressurization seal. In addition, an acoustic seal inflates with service air when the door is closed and the left throttle is out of cutoff. An integrated handrail extends with the door when open to assist entering and exiting via the four-step airstair. A plug-type emergency exit is located in the lavatory on the right-hand side of the cabin.

The glass windshields are designed to meet bird resistance requirements of 14 CFR Part 25. Openable side windows are provided on both sides of the cockpit. Reinforced frame structures surround the main door opening, emergency exit, and windshields providing structural continuity.

The nose section houses the avionics bay and other equipment such as nose wheel steering accumulator, landing gear pneumatic blow-down bottle, emergency braking bottle, and one of two baggage fire suppression bottles. Behind the composite radome is the high-resolution weather radar antenna and processor.

A large, class C heated baggage compartment in the tailcone includes two optical smoke detectors and is accessed from the left side beneath the engine pylon through a door with integrated steps. A baggage fire extinguishing system, utilizing Halon, provides a high discharge bottle (HDB) in the tailcone and a metered discharge bottle (MDB) in the nose. The high discharge bottle is shared with the APU such that its use for either system will shut down both. The MDB automatically provides a slow, continuous flow of agent into the baggage compartment following use of the HDB.

The equipment bay in the tailcone houses the major components of the hydraulic, environmental, electrical distribution, engine and baggage fire extinguishing systems, and some avionics. External access to the equipment bay is provided through a door on the lower right-hand side of the tailcone. An area work light is provided. Additional equipment may also be accessed through removable panels inside the baggage compartment. The APU is located in and accessed through service doors in the aft part of the tailcone.

## 5. WING

The Citation Sovereign utilizes an advanced, moderately swept wing selected for its low aerodynamic drag and favorable approach and landing characteristics.

A three-spar design gives the wing both structural integrity and high internal volume for its integral fuel tanks. It is designed to be damage tolerant and incorporates bonding and riveting techniques with doublers to provide increased skin thickness in highly loaded areas. A shallow drop in the center wing section permits attachment of the fuselage without interruption of the cabin cross-section. Composite fairings blend the wing and fuselage for minimum drag.

Electrically driven aluminum fowler flaps, arranged in three sections on each wing, and hydraulically driven spoilers, five sections per wing, are utilized for lift, drag, and roll control. Conventional ailerons are installed near the wing tips. The wing leading edges are anti-iced using engine bleed air. The wing tips include navigation and anti-collision strobe lights and static wicks.

## 6. EMPENNAGE

For pitch and yaw, the empennage incorporates the appropriate control surfaces and systems, including mach trim, rudder bias, and a single yaw damper. The horizontal stabilizer is designed with no dihedral and is trimable by an electrically driven actuator. The elevators each have anti-float tabs that are interconnected to the horizontal stabilizer. Engine bleed air protects the leading edge of the horizontal stabilizer from ice. A single rudder on the vertical stabilizer controls yaw with a servo type trim tab. A red flashing beacon is mounted on the top.

## 7. LANDING GEAR

The main and nose landing gear each use dual wheel assemblies. The landing gear retraction system is electrically controlled and hydraulically actuated. Each main gear is a trailing link type and retracts inboard into the wing and belly fairing. The nose gear automatically centers while retracting forward into the nose and, when retracted, is enclosed by doors. Extension or retraction takes about eight seconds and all V-speeds associated with the gear equal 210 knots. Single chined tires are used on the nose gear for water and slush deflection. Squat switches on all three gear assemblies provide input to the squat switch logic that affects many systems. Two emergency gear extension methods are provided: a pneumatic blow-down system (independent bottle in nose) and manual gear release handles.

Multi-disc carbon brakes are installed independently on all four main gear wheels and are hydraulically actuated. Toe pedal pressure is transmitted via cables to the brake metering valve which regulates main hydraulic system pressure in proportion to pilot input. The metering valve also applies the brakes automatically during gear retraction to stop wheel spin.

Normal braking power is supplied by the main hydraulic system with back-up provided by a pneumatic system. A separate electrically driven hydraulic pump may be used on the ground only for maintenance and to set the parking brake when the engines are not running. A digital antiskid system provides individual wheel skid protection at any speed, and includes touchdown protection, a feature that prevents braking until the wheels are rotating. The brake back-up system uses a dedicated nitrogen bottle in the nose and if used, does not provide antiskid protection.

Nose wheel steering is controlled through the rudder pedals and through a handwheel on the pilot's side ledge. The two systems are mechanically linked and are connected to the hydraulically powered rack and pinion steering system on the nose gear. The rudder pedals allow steering up to 7 degrees either side of center and the handwheel allows up to 81 degrees. Combined, the nose wheel may be turned up to 85 degrees on either side. A back-up NWS accumulator operates automatically if main hydraulic pressure is lost. All ground handling requires that the nose gear scissor connector be disconnected to allow full castering and to prevent damage.



## 8. POWERPLANTS

Two Pratt & Whitney Canada PW306C turbofan engines are installed, one on each side of the rear fuselage. This engine is a 4.4 to one, high bypass ratio, twin spool design with a damage resistant wide chord fan. Behind the fan, four axial and one centrifugal compressor stages lead to a high efficiency, low emission, through-flow combustor and five turbine stages. Two stage variable inlet guide vanes and bleed-off valves are controlled by the FADEC to optimize compressor performance and engine operability. A forced exhaust mixer improves fuel burn and reduces noise. Maximum static takeoff thrust at sea level is flat rated to 5,770 pounds (25.66 kN) up to 87°F (ISA+15.5°C). Advanced alloys and cooling technologies allow for 6,000 hours between overhauls.

Engine start is accomplished electrically through a starter-generator powered by any of the following sources: the aircraft's two batteries, the auxiliary power unit, the other running engine, or a ground power unit. Both low- and high-pressure engine bleed air is extracted for anti-ice and environmental requirements. Fan air is tapped for pre-cooling of bleed air. A continuous loop fire detection system monitors the nacelle area to detect and warn if a fire occurs. A two-shot fire extinguishing system is provided.

Dual channel Full Authority Digital Electronic Controls (FADECs) provide automation and efficiency in engine management. Detents in the throttle quadrant (takeoff, maximum continuous, high speed cruise) permit optimal power settings based on ambient conditions for each phase of flight. The system also provides engine protection, synchronization, and diagnostic capability.

Hydraulically actuated, target-type thrust reversers are attached to each engine. Deployment takes about one second. The effect of the thrust reversers on runway performance is accounted for under some conditions.

### Auxiliary Power Unit (APU)

A Honeywell RE100[CS] auxiliary power unit is installed in the tailcone to provide supplemental environmental air and electrical power to the aircraft both on the ground and in flight. Its generator is identical to the ones used on the engines, but limited in amperage. It may be started at up to 20,000 feet and operated up to 30,000 feet. Fuel burn for the APU is about 110 to 125 pph.

The APU is not approved for unattended use. However, its electronic control unit monitors all parameters and will automatically shut down the APU if operating limits are exceeded. If fire is detected, the extinguisher (shared with the baggage compartment) will automatically discharge after eight seconds, if not activated sooner by the crew.

## 9. SYSTEMS

### 9.1 Flight Controls

The Sovereign's flight controls consist of dual control wheel columns and adjustable brake and rudder pedals. Unpowered pushrod and cable systems are used to actuate the rudder, elevators, and ailerons. In addition, a handwheel is provided on the pilot's side ledge to control the hydraulically powered rack and pinion nose wheel steering system. The handwheel provides 81° of nose wheel deflection either side of center versus 7° for the rudder pedals. Corrosion resistant stainless steel cables are used in all primary and secondary systems.

The one-piece, trimable, horizontal stabilizer has right and left pilot-actuated elevators. Dual independent cable systems are routed from each pilot's controls to the respective elevator with a mechanical disconnect handle on the pedestal. Stick shakers on each pilot's control column plus an aural tone provide stall warning in addition to instrument indications.

The single rudder is connected to the rudder pedals by a cable system that is split through the non-containment zone. A single yaw damper is included to augment lateral stability throughout the flight envelope. A two-chamber rudder bias system is incorporated for automatic control enhancement during engine-out conditions. The bias system is connected to the rudder through a variable leverage actuator that automatically adjusts for airspeed, providing the greatest leverage below 125 knots.

There are five hydraulically actuated spoiler panels on each wing. The middle three panels modulate in conjunction with the ailerons to augment roll control. All five function as speed brakes in flight and after landing. The aileron surfaces are operated by the pilot's yoke while the roll spoilers are hydraulically actuated and are operated by the copilot's yoke. The two otherwise independent systems are interconnected in the cockpit by a mechanical disconnect system. Within the cable linkage

to the ailerons, a ratio changer provides airspeed-dependent variable mechanical advantage to the pilots for moving the control surfaces at different airspeeds. At high airspeeds the force to move the yoke is reduced by approximately 30 percent.

All trim is electrically controlled. The rudder trim knob and the split aileron trim switches (both on the pedestal) activate motors to change the base position of their respective servo tabs. Split elevator trim switches on each yoke affect the electrically driven primary stabilizer trim actuator to change the angle of incidence of the horizontal stabilizer to any point between negative 6.9 and positive 1.2 degrees. A secondary electric actuator serves as back-up and is controlled by a guarded split switch on the pedestal. When the horizontal stabilizer moves, the interconnected anti-float tabs on each elevator also move to compliment aerodynamic forces. A mach trim system is installed and is effective between 0.76 and 0.80 mach but is not required for dispatch. An integral control lock is provided for the ailerons, elevators and rudder.

Aluminum fowler flaps are arranged in three sections per wing and are controlled through a lever with detents on the pedestal. Asymmetric protection and soft-start are incorporated in the design with one electric motor driving the flaps to one of four positions: up, 7°, 15°, and 35°. Between 15° and 35° a signal is sent to the stabilizer trim actuator to automatically adjust to prevent pitch changes.

### 9.2 Fuel System

Two integral fuel tanks, one in each wing, provide approximately 11,216 pounds (5,087 kg) of usable fuel. System operation is fully automatic with each engine receiving fuel from its respective wing tank. Crossfeed capability is provided and, when selected, enables both engines to receive fuel from a single tank. Tank to tank transfer is not possible.

Electric boost pumps located in the wing roots supply fuel during engine start, APU start, crossfeed, and as needed to supply the required fuel pressure. For each engine a two-stage engine driven pump provides fuel at low and high pressure. Low pressure fuel flows to the fuel/oil heat exchanger and the fuel filter. High pressure fuel is sent back to the primary and scavenge motive flow pumps in the wing tanks and to the hydromechanical metering unit (HMU). The HMU delivers fuel to the engine and to the variable guide vanes actuator and is fully controlled by the FADECs according to pilot demand and ambient conditions. The fuel/oil heat exchangers eliminate the need for an anti-ice additive.

Fuel levels are monitored by an active probe system. Refueling is accomplished through over wing filler ports with locking caps or through the single point refueling / defueling system, which does not require electrical power. Maximum fuel through the single point system is 1,600 gallons or 10,720 pounds (4,862 kg). To fill to maximum capacity, the over wing filler ports must be used.

### 9.3 Hydraulic System

A closed-center, constant pressure 3,000 psi (206.8 bar) hydraulic system operates the landing gear, brakes, nose wheel steering, spoilers, and thrust reversers. Hydraulic pressure is supplied by two engine driven pressure compensating pumps, one located on each engine. Either pump can supply enough flow to operate the system. An electrically powered pump located in the fairing behind the wing performs certain maintenance functions and is available only on the ground to set the brakes for parking. Ground connections to service the system are located on the right side below the engine.

### 9.4 Electrical System

The Sovereign's electrical system incorporates European compliant, split bus architecture with a bus tie, designed so that essential equipment operation will not be interrupted in the event of a single power source or distribution system failure.

Two 28 volt DC, 300 ampere, engine-driven starter/generators supply primary electrical power. A third, identical starter/generator is driven by the APU for supplemental power (up to 30,000 feet) but is limited to 275 amperes. Generator control units provide static regulation, overvoltage, feeder fault, and ground fault protection for each generator. Each engine also drives an alternator to support a dedicated AC system for electrical anti-icing of the windshield. Power for the dual channel FADECs is provided by aircraft power during initial engine start, then by engine driven permanent magnet alternators for normal operations.

Two 24 volt, 44 amp-hour, nickel-cadmium batteries are mounted inside access panels on each side of the fuselage just behind the wings to supply power for starting and emergency requirements. Power for all engine and

## 9. SYSTEMS (Continued)

APU starts is either provided by or assisted by the batteries to minimize the burden on the generators. A receptacle above the right side battery allows connection of an external power unit. Battery voltage, amperage, and temperature monitoring and battery disconnect systems are provided.

One 1,200 watt static inverter supplies 110 volt AC power for the needs of the cabin including 6 outlets: one in the cockpit, one in the lavatory, and four in the cabin.

Exterior lighting consists of one red flashing beacon, two anti-collision strobes, two wing inspection lights, navigation lights, two taxi lights (located on the nose gear), and two landing/recognition lights (located at the wing roots).

### 9.5 Pressurization and Environmental System

The pressurization and air conditioning systems utilize engine or APU bleed air through a single air cycle machine (ACM) to pressurize and air condition the cabin and defog the cabin and cockpit side windows. Ram air for cabin ventilation is available when the pressurization system is not in use. Pressurization is controlled by two outflow valves located in the aft pressure bulkhead. The pressurization controller automatically schedules cabin altitude and rate of change. Ozone converters are included in the bleed air system. The system provides a 7,230 foot (2,204 m) cabin altitude at 47,000 feet (14,326 m) (9.3 psi or 0.64 bar nominal maximum working pressure). Sea level cabin altitude can be maintained to 25,230 feet (7,690 m).

Bleed air is conditioned as it passes through the ACM and is distributed to the cabin and cockpit via overhead air ducts and outlets, under floor ducts, and sideledge air ducts. Two thermostats and a dual-zone temperature controller automatically maintain the cabin and cockpit temperatures separately. The cabin temperature is controlled from the VIP seat location.

### 9.6 Oxygen System

A 76.0 cubic foot (2.15 $m^3$) oxygen bottle, located in the belly fairing, is provided with a high pressure gauge and bottle-mounted pressure regulator. A second 76.0 cubic foot oxygen bottle is available as an option. Pressure demand masks are provided for the crew while automatic dropout, constant-flow oxygen masks are provided at each passenger seat and the lavatory. Oxygen flow to the cabin is controlled by a sequencing regulator valve for optimal passenger usage.

### 9.7 Ice and Rain Protection

Engine bleed air is used for anti-ice protection of the engine inlets and the leading edges of the wing and horizontal stabilizer. Bleed air plumbing is monitored for leaks using eutectic salt sensing lines. The pitot tubes and static ports (mains and standby), and both angle of attack probes are electrically anti-iced using main or emergency DC power. The repellant-coated glass windshields are also electrically heated, however, power for the windshields is provided by dedicated AC alternators, one on each engine, and is on whenever the engines are running. A windshield ice detection light is mounted on the glareshield and two wing inspection lights are mounted on the fuselage to assist in detection of ice buildup during night flights. The two-speed blower fan mounted in the nose avionics bay for avionics cooling is available to assist with rain removal from the windshields during taxi operations.

## 10. FLIGHT COMPARTMENT, AVIONICS AND INSTRUMENTATION

1. Oxygen Pressure Indicator
2. Digital Audio Control Panel
3. PFD / MFD Reversion Control
4. PFD / MFD Source Control
5. Flight Guidance Control Panel
6. Primary Flight Display (PFD)
7. Multi-Functional Display (MFD) and Engine Indicating and Crew Alerting System (EICAS)
8. Standby Flight Display (SFD)
9. Standby Electronic Horizontal Situation Indicator (EHSI)
10. Standby Engine Indicator (SEI)
11. Multi-Function Control Display Unit (MCDU)
12. Weather Radar Controller
13. Cursor Control Device (CCD)
14. Cockpit Voice Recorder (CVR)

FIGURE III — CITATION SOVEREIGN INSTRUMENT PANEL AND PEDESTAL LAYOUT



## 10. FLIGHT COMPARTMENT, AVIONICS AND INSTRUMENTATION (Continued)

### 10.1 General

Described below is the Citation Sovereign standard avionics suite as referred to in Section 17, Limited Warranties.

- Four Modular Avionics Units (MAU) - Honeywell, Two MAR-950s, Two MAR-951s
- Four 8 x 10 inch Flat Panel Liquid Crystal Display Units - Honeywell DU-1080s Designated As:
  - Two Primary Flight Displays (PFD)
  - One Multi-Function Display (MFD)
  - One Engine Indication and Crew Alerting System (EICAS)
- Dual Air Data Modules (ADM) - Honeywell AZ-200
- Dual Attitude Heading Reference Systems (AHRS) - Collins AHC-3000
- Dual Angle of Attack Sensors (AOA)
- Dual Automatic Flight Control Systems (AFCS) with Three Axis Autopilot and Flight Director - Honeywell
- Flight Guidance Controller Panel (GP) - Honeywell GP-400
- Dual Multi-Functional Control Display Units (MCDU) with Integrated Flight Management Systems (FMS) and Global Positioning System (GPS) Receivers - Honeywell MC-850
- Dual Aural Warning / Tone Generation Systems
- Dual EFIS Clocks with Elapse Timers
- Dual Remote Mounted Modular Radio Cabinets - Honeywell MRC-855 Including the Following LRUs:
  - Dual VHF Communication Transceivers
  - Dual Mode S Diversity Transponders - Honeywell XS-857A
  - Dual Navigation Receivers (VOR/Localizer/Glideslope/ Marker Beacon)
  - Dual Distance Measuring Equipment (DME) Receivers
  - Single Automatic Direction Finder (ADF)
- Dual Digital Audio Panels - Honeywell AV-850A
- Dual Cursor Control Devices (CCD) - Honeywell CC-950
- Color Weather Radar With Turbulence Detection - Honeywell Primus 880
- Traffic Collision Avoidance System (TCAS) - ACSS TCAS 2000
- Enhanced Ground Proximity Warning System (EGPWS, Class A) - Honeywell
- Single Radio Altimeter - Honeywell AA-300
- Standby Instruments With Dedicated Air Data Computer, Magnetometer, and Battery Including:
  - Electronic Standby Instrument System (ESIS) - L-3 Communications GH-3000 (referred to as Standby Flight Display - SFD)
  - Electronic Horizontal Situation Indicator (EHSI) - L-3 Communications EHSI-3000
  - Electronic Standby Engine Indicators (SEI) - Ametek
- Aircraft Diagnostics Maintenance System
- Fault Recording and Ground Maintenance Access and Downloading
- Cockpit Voice Recorder (CVR) - L-3 Communications FA2100
- Three Frequency Emergency Locator Transmitter (ELT) - SERPE-EISM Kannad 406 AF

### 10.2 Flight Compartment

Two crew stations are provided with dual controls including control columns with stick shakers, adjustable rudder pedals, and brakes. A handwheel for the nose wheel steering is provided on the pilot's side ledge.

Rheostats control all cockpit lighting systems. Panel lights and electroluminescent (EL) lights provide illumination and blue-white background lighting for all cockpit instruments and switches. Floodlights and individually controlled left and right map lights are located in the overhead panel. Indirect supplemental LED lighting under the glareshield also functions as the emergency lighting for the panel. A day/night switch allows bright/dim control of the panel, EL, and flood lighting. Monorail sunvisors are standard. One AC outlet is provided in the cockpit for crew use. Circuit breakers for the avionics and most systems are located on the cockpit sidewalls beside each pilot seat.

The emergency oxygen system provides two quick-donning, pressure demand masks with microphones for each crewmember.

The crew seats are fully adjustable including lumbar support and include a five-point restraint system with two inertia reel shoulder harnesses each. Sheepskin cover assemblies and dual stowable armrests are standard. A total of eight air outlets are strategically placed for air circulation in the cockpit. Dual cupholders are installed in each side ledge, and map and pencil storage pockets reside just below each side console. For navigation chart storage, dual chart cases are provided behind each crew seat. Additional chart storage is available in the closet behind the pilot's seat.



## 10. FLIGHT COMPARTMENT, AVIONICS AND INSTRUMENTATION (Continued)

### 10.3 Avionics

The Honeywell Primus EPIC system is a highly integrated display, flight guidance, navigation, and communication system with its primary data presented on four 8 x 10 inch (20 x 25 cm) full color flat-panel liquid crystal display units (DUs). The two outboard displays are primary flight displays (PFD) and the two inboard function as a multi-function display (MFD) and an engine indicating and crew alerting system (EICAS).

The backbone of the system is a series of four modular avionics units (MAUs). Each unit is host to various field replaceable circuit cards or modules that perform specific functions. Each MAU is powered by a different electrical bus and cooled individually. Two MAUs reside in the nose and two in the tailcone. All systems are networked through internal and external high-speed bi-directional buses. Nearly all aircraft systems are integrated through the MAUs for processing, coordinating, monitoring, and display.

Some of the major subsystems include:

- Four Electronic Flight Information System (EFIS) Display Units (PFDs, MFD, EICAS);
- Dual Modular Radio Cabinets (MRC) Containing Communication, Navigation, and Surveillance Radios;
- Dual Channel Automatic Flight Control System (AFCS);
- Situational Awareness Sensors, i.e. Weather, Traffic, and Terrain

#### A. Electronic Flight Information System (EFIS)

The EFIS system on the Citation Sovereign presents to the pilots all the essential information required for flight. Navigation, communication, and the condition of the aircraft are all monitored and displayed on the four display units. The DUs have integral symbol generators and cooling fans, and are interchangeable. Each are directly interfaced to the MAUs.

Two attitude heading reference system (AHRS) computers are installed to supply attitude, heading, and flight dynamics information to the flight control and display system. Solid-state sensors and a magnetic flux gate provide highly accurate and reliable data.

A total of three heated pitot sources and six heated static sources feed data to the two main air data modules (ADM) and a backup air data computer (ADC). All three computers are integrated into the pitot-static system to calculate and correct raw static and dynamic air pressures from the ram and static sources. Cross plumbing minimizes yaw errors in the static pressure signals.

Dual reversionary controllers are provided to allow dimming and to meet the manual reversion needs of the DUs, AHRS, and ADMs.

Primary Flight Displays (PFD)

The Sovereign's PFDs present to the pilots the fundamental flight information for location and attitude in space. Additional information provides improved situational awareness and safety. The primary sources of input for display on the PFDs are the AHRS, ADMs, and the various navigation and situation receivers, all of which are processed through the MAUs.

The attitude sphere is shown in the upper half with respect to an aircraft symbol, and incorporates a single cue or cross pointer flight director command bar presentation. To the left of the attitude is the airspeed tape and digits with the ability to show V-speeds, flap speeds, Mach speed, and overspeed and stall speed warnings. An angle of attack indicator (AOA) may be shown full time or only when the flaps and gear are down. Within specific parameters a windshear warning will flash near the center of the attitude display. The marker beacon, glideslope, and slip-skid indicators are each shown in this area. Although traffic is shown on the multi-function display, a resolution advisory (RA) will generate "avoidance" and "fly-to" target symbology on the PFD in lieu of the flight director command bars.

To the right are altimeter and vertical speed indications. The altimeter setting may be shown in inches or hectopascals and the altitude may be shown in meters in addition to feet if desired. A vertical navigation (VNAV) target and bug will appear when activated beside the altitude tape. A low altitude awareness feature triggered by the radio altimeter will cause the lower portion of the tape to be shaded brown when radio altitude is less than 550 feet. Other terrain avoidance warnings appear as triggered by the EGPWS such as "below glideslope." Both the altitude and airspeed tapes feature trend vector thermometers that forecast respective values six seconds ahead.

The lower half of the PFD displays heading, navigation,

## 10. FLIGHT COMPARTMENT, AVIONICS AND INSTRUMENTATION (Continued)

and certain weather data. The heading is displayed as a full compass rose or a partial compass arc. Traditional bearing pointers and course indicators are shown on the compass rose format. For greater situational awareness, the FMS map and weather displays may be overlaid on a 90 degree arc format. The active lateral navigation information is displayed on and beside the rose, arc or map and includes bearings, identifiers, time and distance to waypoint or DME station, and groundspeed. The current wind speed and vector are shown as well as weather radar status. A digital clock and elapse timer are shown on the left and controlled through the PFD display controller and the multi-function control display unit (MCDU). Autopilot/flight director and FMS annunciations and modes are also displayed on the PFD.

Left and right PFD display controllers provide the principle pilot interface with the respective PFD. Several buttons allow selection of navigation sources for the different course deviation indicators and the format for the navigation display: full compass or arc mode. The WX/TERR button permits weather radar video or terrain video to be superimposed on the arc mode. The ET button operates the elapse timer. Two knobs (each dual concentric) are used to select approach minimums and altimeter settings.

Multi-Function Display (MFD)

The MFD shows navigation, communication, traffic, terrain, and weather information for each flight. Various colored lines and symbols show airports, navaids, waypoints, and track lines to provide either a north-up, or heading-up picture of the lateral navigational situation at multiple scales. Vertical navigation may also be selected for display.

Four menu categories reside at the top of the MFD: CHECKLIST, TCAS, MAP, and PLAN. Selection and control of menu items is accomplished through two cursor control devices (CCD) in the pedestal. Selection of 'MAP' view shows the flight plan in a 120° arc with the heading up and a centrally-fixed aircraft symbol. Selection of the 'PLAN' view shows true north up and the aircraft symbol in motion as oriented by its heading. Weather radar graphics or terrain information from the EGPWS (exclusive of each other) may be selected through the MAP menu. Selection of 'CHECKLIST' opens several options at the bottom center of the display including normal, abnormal, and emergency checklists. 'TCAS' will show the traffic options and may be displayed on both the MAP and PLAN views.

A portion of the lower half of the display contains full-time information. The full-time data is always in view and includes navigation and communication frequencies, transponder setting, temperatures, speeds, a timer, current waypoint identifier with ETE, and the current mode of the TCAS and weather radar. The central maintenance computer is also accessed through the MFD. The CCD is used to interact with these functions.

Engine Indicating and Crew Alerting System (EICAS)

The Sovereign's EICAS display is divided into four sections: engine instruments, aircraft systems, radio tuning, and crew alerting system annunciations.

The engine instrument area shows engine, oil, and fuel parameters in various combinations of vertical tapes and digits. In some cases, pilots have the option to show digits full time or only in the event of exceedances. Ram air temperature, FADEC and igniter status, and thrust reverser indications appear in this area also. All displays are intuitively color coded to represent normal and abnormal conditions.

The aircraft systems section shows status and values for the electrical and hydraulic systems. All three trim axis positions and the flaps, speed brakes, and spoiler positions are shown in a visually synoptic presentation, including digits for the flaps and horizontal stabilizer angles. The communication, navigation, and transponder functions are shown at the bottom of the EICAS display and are controlled via the cursor control device in the same way as for the MFD.

Crew alerts are processed by the modular avionics units (MAUs) and displayed in colored text in the lower left section of the EICAS. Up to 12 messages may be displayed at a time with access to additional messages by scrolling. Explicit rules are employed to govern the color, order, flashing, and scrolling of all messages. Special logic and timing of messages and the combining of redundant messages are performed by the MAUs to minimize workload and distractions, and to provide pilots with the most relevant information for the flight regime and condition.

A dual aural warning function (AWF), part of the MAUs, prioritizes any alert conditions between EGPWS, TCAS,



## 10. FLIGHT COMPARTMENT, AVIONICS AND INSTRUMENTATION (Continued)

and EICAS systems to command pilot attention as required. Left and right red Master Warning and amber Master Caution switchlights are also activated according to MAU logic.

### B. Cursor Control Device (CCD)

The Sovereign features two cursor control devices (CCD) mounted aft of the throttle quadrant. The CCDs are the primary means of pilot interface with the EFIS by allowing a cursor to be moved about on the EICAS and MFD to select and change such things as MFD menus and radio frequencies.

Each CCD is ergonomically designed for the hand to rest and allow the fingers to manipulate the trackball to move the cursor on the display units. Each pilot may place their own cursor (pilot-blue, copilot-green) on the MFD or the EICAS by pressing one of the three display selection keys immediately ahead of the trackball. The PFDs may also be selected (by the respective pilot only) for changing HSI display range, however, the cursor itself will not be visible. 'Enter' buttons on each side are used to make selections and are both identical in function. Two concentric knobs are used to change the digits or range of the selected function. A dedicated TCAS button brings the TCAS menu into view.

### C. Multi-functional Control Display Units (MCDU)

Forward of the throttle quadrant are two MCDUs, providing all FMS functions, a means to change various avionics settings, and a second radio tuning method. The crew operates the units through use of keys and dual concentric knobs. The two units are synchronized to coordinate data entry from one to the other. The bottom line on the screen is a scratchpad for initial entry until the data is selected.

Navigation, Surveillance

The navigation radios incorporate all the common functions including VOR, ILS/localizer, glideslope, marker beacon, ADF, DME, and GPS. Each DME module is capable of tracking four channels at the same time. The ADF has two selectable bandwidths; a narrow band mode to reduce noise during navigation and a wide band mode to improve clarity when listening to voice signals. The two transponders are Mode-S and utilize two antennae each for diversity function. Enhanced surveillance capability is available as an option. The two GPS receiver modules are located in two of the MAUs.

Communication

The VHF communication radios provide 25 or 8.33 kHz spacing. In addition to radio tuning, the radio pages provide the means for setting 12 NAV and 12 COM frequencies into memory. All radios and transponders are physically located in two modular radio cabinets (MRC) in the tailcone.

Flight Management System (FMS)

The FMS functions are accessed from the Flight Plan page on the MCDU. Plans may be created, stored, accessed and activated as needed. The active flight plan will automatically tune the navigation radios enroute. Precision guidance from the FMSs meets the operational requirements of oceanic/remote, NAT MNPS, RNP10, RNP5/BRNAV and RNP1.0/PRNAV. The navigation database requires periodic updates via subscription and may be uploaded to the aircraft via the connectors on the aft pedestal. Cessna provides an interface kit for use with a Purchaser-supplied laptop computer to accomplish the updates. The Honeywell FMS annual subscription fee is the responsibility of the Purchaser and may be activated during delivery.

Several features are presented on the Avionics Setup page: elapse and flight timers, EGPWS settings, display settings for various EFIS functions such as the flight director command bars and the AOA indicator, test functions, and V-speeds.

### D. Automatic Flight Control System (AFCS)

Automatic flight control is provided in the Sovereign by a dual autopilot system (AP) including actuators, one electric servo per axis, a yaw damper (not required for dispatch), and a guidance panel (GP) in the center-top of the instrument panel. The system is designed with dual channel architecture to provide "fail-operational / fail-passive" capability, meaning, the failure of one channel causes automatic reversion to the other channel without any loss of functionality.

The main pilot interface to the AFCS is through the guidance panel. Pushbutton engagement of the autopilot is near the center of the panel, as well as coupling to the desired PFD. When engaged, basic modes are maintained by the autopilot. Alternatively, the flight director (FD) may be activated to show command bars on the



## 10. FLIGHT COMPARTMENT, AVIONICS AND INSTRUMENTATION (Continued)

respective PFD in the selected mode. The AP and FD may be coupled to provide automatic flight control. Lateral and vertical modes are selected on the GP beside the heading and altitude select knobs. Two course select knobs are also located on the GP for use in the navigation modes. Two pitch wheels, one in the center of the GP and one on the pedestal, allow pilot input for pitch angle, the airspeed bug, and to select vertical speed rate. In addition to normal modes of operation, the AFCS provides touch control steering (TCS) via switches on each yoke, stall protection, and an emergency descent mode.

### E. Audio Control Panels, Headsets and Speakers

Dual Honeywell AV-850A digital audio amplifiers provide transmitter selection from microphone inputs and direct audio outputs for all receivers to either the speaker or headphones at each crew station. Also included are a navigation station identification filter, marker beacon muting, separate headphone and speaker volume control, automatic receiver audio selection, cabin address, and voice activated interphone.

Two Telex Airman 850 headphones with boom microphones are provided. Dual Telex hand microphones latch on each control column and two cockpit speakers are mounted overhead. Cockpit speaker mute switches are located on the far left and right of the tilt panel. Speakers are also provided in the cabin and vanity area.

### F. Weather Avoidance Radar

The Honeywell Primus 880 weather radar is a four-color weather and turbulence detection sensor consisting of an integrated receiver/transmitter/12-inch antenna unit with an independent controller mounted on the pedestal. The system provides 10,000 watts of transmitter power, 120 degree scan angle, ±15 degrees tilt, and turbulence detection to 50 nm. The system also includes several additional features: Altitude compensated tilt which automatically adjusts the tilt angle with changes in altitude; Target alert notifies the pilots of hazardous targets outside the selected range; Sector scan narrows the scan range and increases the scan rate; and ground mapping for depicting terrain features.

### G. Traffic Collision Alert System (TCAS)

The TCAS 2000 by ACSS consists of a TCAS II system that provides simultaneous tracking of up to 50 intruder aircraft. A maximum of 32 aircraft targets may be displayed along with their relative altitudes and positions at ranges up to and potentially beyond 40 nm. Traffic alerts and resolution advisories, with audio and EFIS display warnings, are generated for the targets with the highest threat level. TCAS 2000 meets or exceeds all current regulatory requirements (European ACAS II and Change 7). (Note: This system is installed to provide collision avoidance information and will not necessarily display aircraft within the monitoring area that do not pose a threat.)

### H. Terrain Avoidance Warning System (TAWS)

The Honeywell Enhanced Ground Proximity Warning module (EGPWS) is a Class A TAWS that helps prevent accidents caused by controlled flight into terrain (CFIT) or severe windshear. The system provides basic ground proximity warning, windshear detection and alerting, and terrain awareness alerting and warning. The system displays proximate terrain information in color on the MFD and gives both audible and visual warnings. The terrain database includes charted manmade obstacles in North America and some obstacles in other parts of the world. The EGPWS installation on the Citation Sovereign will meet and/or exceed 14 CFR Part 91, 14 CFR Part 135, and JAR-OPS 1 requirements.

### I. Radio Altimeter

The Honeywell AA-300 Radio Altimeter system provides height above the terrain from 2,500 feet (762 m) to touchdown. This information is integrated with functions in the EFIS, TCAS II, and EGPWS and is presented on the PFDs.

### J. Backup And Emergency Instruments

Standby instruments are installed in the center of the instrument panel and are normally powered by the aircraft's main DC power. In the event power is interrupted, the standby battery in the nose compartment provides up to 3 hours additional duration. A panel switch controls operation and testing.

Four standby annunciators are located at the top of the center panel and are included on the emergency bus: low fuel, stabilizer no takeoff, generator off, and oil pressure low.

The secondary flight display (SFD) receives data from

## 10. FLIGHT COMPARTMENT, AVIONICS AND INSTRUMENTATION (Continued)

the standby air data computer and normally shows attitude, air data, slip/skid, and menu items. The SFD also backs up the EHSI and may show heading and navigation information.

The electronic horizontal situation indicator (EHSI) uses a dedicated magnetometer and signals from the navigation radios and FMS to present heading, range, navigation, and course deviation data in an HSI format. A standby slave switch on the panel may be used to select directional gyro mode when necessary.

Standby engine indications (SEI) include N1, N2 and ITT for each engine and are displayed in digits on the standby engine indicator at the bottom of the center panel. Exceedances cause the respective digits to flash.

The cockpit voice recorder (CVR) has four high quality and two standard quality channels, loop-recorded for 30 minutes and 2 hours respectively from the pilot and copilot's audio communications and the area microphone (just above the EICAS) to a crash-survivable solid-state flash memory unit in the tailcone. The CVR is equipped with a six year lithium battery and an underwater locator beacon. The control head is located on the pedestal.

A three-frequency emergency locator transmitter (ELT) is mounted overhead in the aft baggage compartment and, if activated, transmits the standard emergency signal on 121.5 and 243 MHz plus aircraft specific encoded data on the COSPAS-SARSAT satellite frequency of 406.025 MHz. The ELT houses its own six-year lithium battery pack and meets or exceeds all FAA and JAA certification requirements. The transmitter will activate automatically or manually via a remote control panel located in the cockpit aft of the copilot's circuit breaker panel.

### K. Other Cockpit Instrumentation

Additional cockpit instrumentation includes the following:

- External lighting switch panel including landing, taxi, recognition, and anti-collision
- Rotary test knob for functional testing of 10 different systems
- An event marker button on the left side panel sends a five-minute engine and FADEC trace to the engine diagnostic system for future maintenance download and analysis
- A flight time meter



CITATION
SOVEREIGN

## 11. INTERIOR

### 11.1 Cabin

The Citation Sovereign is sized to offer passenger comfort and flexibility for a variety of interior arrangements. A full range of fabrics, leathers, carpets, laminates, selected wood veneers and metal finishes are available to custom configure the interior furnishings to meet a wide variety of customer tastes. Certified burn-resistant materials are used throughout the cockpit and cabin. Bagged soundproofing and insulation are consistent with this category of aircraft, its operating speeds, and environment.

The flight compartment (discussed in section 10.2) is separated from the cabin by dividers. The cabin is approximately 25 feet 3 inches (7.70 m) long and extends from the flight compartment dividers to the aft pressure bulkhead. The constant section of the cabin provides a continuous width of 66 inches (1.68 m) measured softgoods to softgoods. A dropped aisle with indirect lighting extends aft from the cockpit divider to the aft wall of the lavatory and provides a cabin height of 68 inches (1.73 m) measured softgoods to softgoods.

Cabin-length indirect LED lighting is provided overhead in the Passenger Service Units (PSU) with infinite adjustment settings. Entrance and emergency exit lights are also provided. Fifteen elliptical windows with pleated electric window shades allow generous natural lighting throughout the cabin and lavatory.

The standard aircraft features a right hand refreshment center (31 inches wide) with two hot beverage tanks, large ice drawer, large trash receptacle, numerous storage areas, glassware capability and provisions for ample catering. A left hand coat closet forward of the cabin entry door accommodates navigation charts, flight manuals, and coat and briefcase storage as well as a fire extinguisher.

The cabin supports a variety of seating configurations. The standard arrangement accommodates nine passengers in a double-club with a single forward side facing seat just aft of the refreshment center. The eight pedestal seats track forward and aft 7 inches (.18 m) and laterally 4 inches (.10 m) on the seat base with 360 degree swiveling capability. These seats recline to an infinite number of positions including full berthing. All passenger seats are equipped with seat belts, an inertia reel shoulder harness, and an overwater life vest stored in the seat base shroud.

Individual air outlets and reading lights are provided in the PSU above each passenger seat and over the vanity. The customer may designate a VIP seat to incorporate all indi-

CABIN DOOR
EMERGENCY
EXIT

FIGURE IV — CITATION SOVEREIGN STANDARD FLOORPLAN

## 11. INTERIOR (Continued)

rect lighting and cabin temperature controls. Two cupholders are built into the side ledge next to each seat. A single insertable ashtray is provided. Four executive tables fold out from between each facing pair of seats and are illuminated by direct reading lights. Six individual 110 volt AC, 5 amp outlets (four in the cabin, one each in the cockpit and lavatory) are installed to operate laptop computers, etc. Dropout, constant-flow oxygen masks are installed over the aisle for emergency use.

The aft lavatory has an externally serviceable flushing toilet (non-belted) and is separated from the cabin by sliding divider doors. It includes a vanity sink with temperature controlled water and numerous storage compartments. Within the lavatory a large centerline closet accommodates several hanging clothes bags, coats, briefcases and additional storage for passenger amenities.

### 11.2 Baggage Compartments

The Sovereign has forward and aft baggage storage closets in the cabin to accommodate passengers' carry-on luggage and coats. The following limits apply:

- Forward coat closet - 140 lb (63.5 kg), 8 ft$^3$ (0.23 m$^3$)
- Aft bulkhead closet - 275 lb (124.7 kg), 27 ft$^3$ (0.76 m$^3$)
- Combined total - 415 lb (188.2 kg), 35 ft$^3$ (0.99 m$^3$)

In addition, a heated baggage compartment with a coat rod is located in the tailcone subject to the following limits:

- 1,000 lbs (453 kg), 100 ft$^3$ (2.83 m$^3$) total
- Floor loading limit - 150 lb (68.0 kg) per ft$^2$
- Coat rod - 50 lb (22.7 kg), part of the total limit

The compartment is located on the left hand side and is accessible through a lockable door with an integral step. A toggle switch is recessed into the door frame to control the baggage compartment lights. If inadvertently left on, the lights will turn off automatically when the door closes.

## 12. EXTERIOR

Distinctive exterior styling featuring polyurethane paint in a variety of colors is provided.

## 13. ADDITIONAL EQUIPMENT

- Two Telex Airman 850 Headsets
- FMS Interface Kit
- Pitot Covers
- Static Discharge Wick Covers
- Engine Inlet and Exhaust Covers
- Thrust Reverser Stow Locks
- Emergency Door Ground-Locking Pin
- Center Aisle Carpet Assembly
- Interior Cleaning Kit
- Six Umbrellas
- Cargo Net
- Jack Pad Adapters
- Main Landing Gear Jacking Adapters

## 14. EMERGENCY EQUIPMENT

- Fire Extinguisher in Cockpit and Cabin
- Individual Overwater Life Vests
- Crew and Passenger Oxygen
- Emergency Exit Lights
- Emergency Lighting Battery Packs
- First Aid Kit
- Flashlight (two D-cells)
- Water Barrier

## 15. DOCUMENTATION AND TECHNICAL PUBLICATIONS

- U.S. Standard Airworthiness Certificate FAA8100-2, Export Certificate of Airworthiness FAA8130-4, or Special Airworthiness Certificate FAA8130-7 as appropriate
- Weight and Balance Data Sheets
- Flight Manual
- Equipment List
- Weight and Balance Report
- Pilot's Operating Manual
- Abbreviated Procedures Checklist
- Interior Components Operations Manual
- Log Books (Aircraft and Engines)
- Avionics Wiring Booklet *
- Maintenance Manual (Airframe) *
- Illustrated Parts Catalog (Airframe) *
- Wiring Diagram Manual (Airframe) *
- Weight and Balance Manual *
- Interior Maintenance Manual *
- Component Maintenance Manual *
- Structural Repair Manual *
- Nondestructive Testing Manual *
- Illustrated Tool and Equipment Manual *



## 15. DOCUMENTATION AND TECHNICAL PUBLICATIONS (Continued)

- Maintenance Manual (Engine) **
- Illustrated Parts Catalog (Engine) **
- Service Bulletins and Service Letters (Engine) **
- Maintenance Manual (APU) ***
- Illustrated Parts Catalog (APU) ***
- Service Bulletins and Service Letters (APU) ***
- Passenger Information Cards
- Additional Miscellaneous Information Concerning Engine and Airframe Support

Cessna will provide Service Bulletins, Service Letters and manual revisions for documents published by Cessna for five years beginning from the start date of airframe warranty.

* These publications are provided on CD-ROM or DVD.
** These publications / revisions are provided directly from Pratt & Whitney Canada.
*** These publications / revisions are provided directly from Honeywell.

## 16. COMPUTERIZED MAINTENANCE RECORD SERVICE (CESCOM)

Cessna will provide an online computerized maintenance record service for one full year from the date of delivery of a Citation Sovereign to the Purchaser.

This service will provide management and operations personnel with the reports necessary for the efficient control of maintenance activities. The service provides an accurate and simple method of keeping up with aircraft components, inspections, service bulletins and airworthiness directives while providing permanent aircraft records of maintenance performed.

Reports, available on demand, show the current status, upcoming scheduled maintenance activity and the history of the aircraft maintenance activity in an online format which is printable locally. Semi-annual reports concerning projected annual maintenance requirements, component removal history and fleet-wide component reliability are provided as part of the service.

Services are provided though a secure internet site requiring a computer with internet connectivity. A local printer is required to print paper versions of the online reports and documentation. If receiving these services through the internet is not feasible for an operation, a paper based service delivered through the U.S. mail is available at an additional fee.

## 17. LIMITED WARRANTIES

The standard Citation Sovereign Aircraft (Aircraft) Limited Warranty covers the aircraft, other than Pratt & Whitney Canada (P&WC) engines and associated engine accessories and the Honeywell auxiliary power unit (APU) and the associated APU accessories which are warranted separately and directly by P&WC and Honeywell, respectively, is set forth below. Cessna specifically excludes vendor subscription services and the availability of vendor service providers for Optional and Special Equipment Request (SER) equipment from Cessna's Limited Aircraft Warranty. Following Cessna's Limited Warranty, the P&WC engine and engine accessory warranty is set forth as well as an outline of the Honeywell APU and APU accessories warranty. All warranties are incorporated by reference and made a part of the Purchase Agreement. All warranties are administered by Cessna.

### 17.1 Cessna Citation Sovereign Limited Warranty (Limited Warranty)

Cessna Aircraft Company (Cessna) expressly warrants each new Citation Sovereign Aircraft (exclusive of engines and engine accessories supplied by P&WC or APU and APU accessories supplied by Honeywell, both of which are covered by their individual and separate warranties), including factory-installed avionics and other factory-installed optional equipment to be free from defects in material and workmanship under normal use and service for the following periods after delivery to the first user:

(a) Five years or 5,000 operating hours, whichever occurs first, for Aircraft component parts manufactured by Cessna;

(b) Five years or 5,000 operating hours, whichever occurs first for standard Honeywell aircraft avionics;

(c) Two years for all other standard aircraft avionics; and

(d) One year for optional avionics, Special Equipment Requests (SERs), interior furnishings and exterior paint and all vendor items including engine or APU accessories supplied by Cessna unless otherwise stated in the Optional Equipment Selection Guide.



## 17. LIMITED WARRANTIES (Continued)

Any remaining term of this Limited Warranty is automatically transferred to subsequent Purchasers of the Aircraft.

Cessna's obligation under this Limited Warranty is to repair or replace, at its sole option, any part or parts which within the applicable warranty period are returned at the owner's expense to Cessna or any Cessna-owned or Cessna-authorized Citation Service Facility (defined as a Citation Service Facility authorized by Cessna to work on your model aircraft) with completed claim information and which, upon examination by Cessna or its designee, are found to be defective. The replacement part must have been procured from Cessna or a Cessna-owned or Cessna-authorized Citation Service Facility, and the defective part and claim information returned to the Cessna Facility where such replacement part was procured. Such replacement parts are only warranted for the remainder of the applicable original aircraft warranty period. A new warranty period is not established for replacement parts. The repair or replacement of defective parts under this Limited Warranty will be made by any Cessna-owned or Cessna-authorized Citation Service Facility without charge for parts and/or labor for removal, installation and/or actual repair. All import duties, customs brokerage fees, sales taxes and use taxes, if any, on such warranty repairs or replacement parts are the warranty recipient's sole responsibility. (Location of Cessna-owned and Cessna-authorized Citation Service Facilities will be furnished by Cessna upon request.)

This Limited Warranty applies to only items detailed herein which have been used, maintained, and operated in accordance with Cessna and other applicable manuals, bulletins, and other written instructions. However, this Limited Warranty does not apply to items that have been subjected to misuse, abuse, negligence, or accident; to items that have been installed, repaired, or altered by repair facilities not authorized by Cessna; or to items that, in the sole judgment of Cessna, have been installed, repaired, or altered by other than Cessna-owned service facilities contrary to applicable manuals, bulletins, and/or other written instructions provided by Cessna so that the performance, stability, or reliability of such items are adversely affected. Limited Warranty does not apply to normal maintenance services (such as engine adjustments, cleaning, control rigging, brake and other mechanical adjustments, and maintenance inspections); or to the replacement of service items (such as

brake linings, lights, filters, de-ice boots, hoses, belts, tires, and rubber-like items); or to normal deterioration of appurtenances (such as paint, cabinetry, and upholstery), corrosion, or structural components due to wear and exposure.

**WITH THE EXCEPTION OF THE WARRANTY OF TITLE AND TO THE EXTENT ALLOWED BY APPLICABLE LAW, THIS LIMITED WARRANTY IS EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESSED OR IMPLIED, IN FACT OR BY LAW, APPLICABLE TO THE AIRCRAFT. CESSNA SPECIFICALLY DISCLAIMS AND EXCLUDES ALL OTHER WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THE AFOREMENTIONED REMEDIES OF REPAIR OR REPLACEMENT ARE THE ONLY REMEDIES UNDER THIS LIMITED WARRANTY. CESSNA EXPRESSLY AND SPECIFICALLY DISCLAIMS ALL OTHER REMEDIES, OBLIGATIONS, AND LIABILITIES, INCLUDING, BUT NOT LIMITED TO, LOSS OF AIRCRAFT USE, LOSS OF TIME, INCONVENIENCE, COMMERCIAL LOSS, LOSS OF PROFITS, LOSS OF GOODWILL, AND ANY AND ALL OTHER CONSEQUENTIAL AND INCIDENTAL DAMAGES. CESSNA NEITHER ASSUMES NOR AUTHORIZES ANYONE ELSE TO ASSUME ON ITS BEHALF ANY FURTHER OBLIGATIONS OR LIABILITIES PERTAINING TO THE AIRCRAFT NOT CONTAINED IN THIS LIMITED WARRANTY.**

### 17.2 New Engine Warranty

The following is an outline of the Pratt & Whitney Canada (P&WC), warranty for new PW306C engines.

P&WC warrants that at the time of delivery all parts of a new engine comply with the relevant specification and are free from defects in material and/or manufacturing workmanship.

This warranty shall take effect immediately upon delivery of the engine to the original operator, either installed in an aircraft or delivered as a spare, and shall remain in force until the expiration of 3,000 engine operating hours (EOH) or Five (5) years, whichever occurs first. Notice of warranty defect must be provided to P&WC within 30 days of the occurrence, and P&WC reserves the right to refuse any warranty claim received more than 180 days after the removal from operation of any engine or engine part.



CITATION
SOVEREIGN

## 17. LIMITED WARRANTIES (Continued)

### Application

This warranty is applicable only to engines operated on non-military aircraft used for commercial, corporate, or private transportation service.

### Coverage

P&WC will repair or replace any parts found to be defective due to a defect in material and/or manufacturing workmanship (including resultant damage to the engine) within 3,000 EOH or 5 years, whichever occurs first. P&WC will pay reasonable engine removal and reinstallation costs and reasonable transportation costs (excluding insurance, duties, customs brokerage charges and taxes) to and from a facility designated by P&WC, Warranty Administration.

### Extended Coverage

After expiration of new engine warranty, P&WC will provide commercial support to assist an operator in the event of extensive damage to an engine resulting from a chargeable defect. This maximum event cost will be based on total engine hours and cycles run since new, or since last overhaul, adjusted for engine age, as well as environmental and operating conditions. P&WC reserves the right to cancel or change this extended coverage at any time.

### Operator's Responsibility

The operator is responsible for operating and maintaining the engine in accordance with P&WC's written instructions. Any warranty work performed on the engines must be carried out at a facility designated by P&WC, Warranty Administration. P&WC shall not be responsible for defects or damages resulting from improper use, improper maintenance, normal wear, accident or foreign object damage (FOD).

### Limitations

Other terms and conditions apply to the warranty and extended engine service policy outlined above. A complete copy of the warranty for new engines and extended engine service policy will be available from P&WC, Warranty Administration. In no event shall P&WC be responsible for incidental or consequential damages.

For complete information on how this warranty may apply and for more complete warranty details, please write to:

Manager, Warranty Administration (01RD4)
Pratt & Whitney Canada
1000 Marie Victorin
Longueuil, QC J4G 1A1
Canada

### 17.3 Summary of Honeywell APU Warranty

The following is an outline of the Honeywell warranty for the new RE100[CS] APU.

Each RE100[CS] APU sold for installation as original equipment on new aircraft will, at the time of delivery to the aircraft operator, be free from defects in material and workmanship and shall conform to the applicable specifications. Warranty shall expire after five (5) years or 2,500 APU operating hours, whichever occurs first.

The above APU warranty is provided as a general description only. Specific terms and conditions are available through Honeywell (Garrett Division) or Cessna.

For complete information on how this warranty may apply and for more complete warranty details, please write to:

Honeywell Engines
Post Office Box 29003
Phoenix, Arizona 85038-9003

## 18. CITATION SOVEREIGN CREW TRAINING AGREEMENT

Training for one (1) Citation Sovereign crew will be furnished to First Retail Purchaser (hereinafter called the "Purchaser"), subject to the following:

1. A crew shall consist of up to two (2) licensed pilots with current private or commercial instrument and multi-engine ratings and a minimum of 1,500 hours total airplane pilot time and up to two (2) mechanics with A&P licenses or equivalent experience.

2. Training shall be conducted by Cessna or by its designated training organization.

   a. A simulator shall be utilized which is FAA certified to provide training for the CE-680 FAA type rating.

   b. In lieu of a model specific simulator, training will be provided in the most appropriate type simulator available capable of accomplishing the FAA type rating, with differences training provided.

## 18. CITATION SOVEREIGN CREW TRAINING AGREEMENT (Continued)

c. Additional training as requested by the Purchaser, shall be conducted in the Purchaser's aircraft.

d. Location of training to be Wichita, Kansas, or Farnborough, United Kingdom* unless mutually agreed otherwise. The organization conducting the training is hereinafter called the "Trainer."

* A European Price Differential charge will apply to all training received at the Farnborough, United Kingdom facility.

3. Training furnished shall consist of the following:

a. Flight training to flight proficiency in accordance with Trainer's standards aimed toward type certification of two (2) Captains under applicable Federal Air Regulations not to exceed five (5) total hours for the two (2) pilots.

b. Flight simulation training to simulator proficiency in accordance with Trainer's standards but not to exceed fifty (50) total hours for both pilots.

c. Ground School training for each pilot and classroom instruction for each mechanic in accordance with Trainer's standards.

4. Purchaser shall be responsible for:

a. Transportation of crew to and from training site and for living expenses during training.

b. Providing an interpreter during the course of training for any of Purchaser's crew not conversant with the English language.

c. Payment to Trainer for additional simulator or flight training beyond that required to attain proficiency in accordance with Trainer's standards for the course in which the pilot is enrolled.

d. All aircraft required for flight training as well as all landing fees, fuel costs, aircraft maintenance and insurance and all other direct costs of operation, including applicable taxes required in connection with the operation of said aircraft during such flight training.

e. Payment to Trainer for a European Price Differential in the event training is conducted at Trainer's Farnborough facility.

f. Extra charges, if any, for scheduling pilots in separate training classes.

g. Reimbursing to Seller the retail rate for training in the event of training before actual sale/delivery, if sale/delivery is cancelled.

5. Seller or Trainer shall schedule all training, furnish Purchaser schedules of training and endeavor to schedule training at a convenient time for Purchaser. A cancellation fee of Two Hundred Dollars ($200) will be paid by Purchaser if crew fails to appear for scheduled training, except for reasons beyond its reasonable control, unless Purchaser gives Seller written notice of cancellation received at Wichita, Kansas, at least seven (7) days prior to scheduled training. In the event of such cancellation Seller shall reschedule training for the next available class.

6. Neither Seller nor Trainer shall be responsible for the competency of Purchaser's crew during and after training. Trainer will make the same efforts to qualify Purchaser's crew as it makes in training of other Citation Sovereign crews; however, Seller and Trainer cannot guarantee Purchaser's crew shall qualify for any license, certificate or rating.

7. Neither Seller nor Trainer shall be responsible for any delay in providing training due to causes beyond its or their reasonable control.

8. All Training furnished to Purchaser under the Agreement will be scheduled to commence no earlier than three (3) months prior to delivery and will be completed within twelve (12) months after delivery of the Aircraft unless mutually agreed otherwise.

Signature of the Purchaser to the Purchase Agreement to which this Training Agreement is attached as a part of the Specification and Description shall constitute acceptance by Purchaser of the foregoing terms and conditions relative to training to be furnished by Seller. Purchaser agrees that Seller can provide Purchaser's name and address to the training organization for the purpose of coordinating training.



CITATION
SOVEREIGN

Exhibit B Purchase Agreement No. CJ-SOV-____________

## *SPECIAL CONDITIONS*

1. Seller, in the sequence of firm orders received with similar requests, agrees to notify Purchaser of the availability of an earlier non-demonstrator Citation Sovereign, if the Aircraft delivery date can be improved by at least 90 days. Upon notification by Seller of the availability of an earlier non-demonstrator Citation Sovereign, Purchaser shall have three working days to accept or decline Seller's offer of an earlier non-demonstrator unit at the then applicable base price. If Purchaser declines or does not respond to Seller's offer, Purchaser agrees this clause has been satisfied and Purchaser will be removed from Seller's notification list.

2. In lieu of the standard FlightSafety International (FSI) training package, Seller agrees to provide Purchaser with three (3) additional Pilot Initial Training courses, for a total of Five (5), as well as one (1) additional Mechanic courses, for a total of three (3), at no additional cost to Purchaser.

3. Seller agrees to provide Purchaser with Cessna's published ProParts and AuxAdvantage Program for a period of two (2) years or 800 hours, whichever occurs first, at no additional cost to Purchaser. The details of the ProParts and AuxAdvantage coverage shall be provided under separate agreement, which shall be signed by Purchaser prior to Aircraft delivery. Limitations apply and will be described in the ProParts and AuxAdvantage program agreement.

4. Seller agrees to provide Purchaser domestic RVSM document preparation services at no additional cost to Purchaser.

Please Initial:

Purchaser: ___________

Seller: _______________

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**
EXTREME CRAFTS VII, LLC

**(b)** County of Residence of First Listed Plaintiff PALM BEACH Co, FL
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
DEBORAH S. MARTIN, ESQ.
WALTER H. MESSICK, P.A.
1900 CORPORATE BLVD., STE. 101 WEST
BOCA RATON, FL 33431
TEL.: 561-213-4012

**DEFENDANTS**
CESSNA AIRCRAFT COMPANY

County of Residence of First Listed Defendant SEDGWICK Co., KS
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

(d) Check County Where Action Arose: ☐ MIAMI-DADE ☐ MONROE ☐ BROWARD ☑ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

10CV80292 KLR/AEV

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☑ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus-Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)
☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed- (see VI below) ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):
a) Re-filed Case ☐ YES ☑ NO b) Related Cases ☐ YES ☑ NO
JUDGE DOCKET NUMBER

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause **(Do not cite jurisdictional statutes unless diversity):**
28 U.S.C. 1332
ACTION FOR DECLARATORY JUDGMENT AND UNJUST ENRICHMENT.
LENGTH OF TRIAL via 3 days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ DECLARATORY RELIEF
CHECK YES only if demanded in complaint: **JURY DEMAND:** ☐ Yes ☑ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**
SIGNATURE OF ATTORNEY OF RECORD [signature]
DATE 2-17-10

**FOR OFFICE USE ONLY**
AMOUNT 350 RECEIPT # 726864 IFP